PGMEDIA, INC. D/B/A Name.Space™,
Plaintiff,

v.

NETWORK SOLUTIONS, INC. and the
National Science Foundation,
Defendants.

No. 97 CIV.1946 RPP.

United States District Court,
S.D. New York.

March 16, 1999.

Paul, Weiss, Rifkind, Wharton & Garrison, New York by Daniel Lefell, Blumenfeld & Cohen, Washington, DC by Gary M. Cohen, Glenn Manishin, for Plaintiff.

Sullivan & Cromwell, New York by William M. Dallas, Jr., Anthony Candido, Hanson & Malloy, Washington, DC by Philip L. Sbarbaro, for Defendant Network Solutions, Inc.

Mary Jo White, United States Attorney for the Southern District of New York, New York by Steven Haber, for Defendant National Science Foundation.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Now pending before the Court are the motion of plaintiff PGMedia, Inc., d/b/a name space™ ("PGM") for summary judgment on Count VI of its second amended complaint, a claim for declaratory judgment[1]; the cross-motion for summary judgment on Count VI of defendant Network Solutions, Inc. ("NSI"); and the cross-motion of defendant National Science Foundation ("NSF" or "the Government"[2]) for an order staying this matter or, in the alternative, for summary judgment as to Count VI. For the reasons set forth below, PGM's motion is denied as to both defendants; NSI's cross-motion is granted; and NSF's cross-motion for summary judgment is granted.

## Background

This complaint seeks to change the control of the vast network of computer networks known as the Internet. More specifically, it is a case concerning the authority to register domain names on the Internet. Domain names are something akin to mail addresses. But unlike real space, in cyberspace there is no logical connection between one's address and one's physical location on a defined map such that the address is easily discernable. Instead, in cyberspace one can choose virtually any domain name, with certain limitations. One limitation is that the domain name can end with one of only a handful of so-called top level domains ("TLD's").[3]

There are currently seven generic TLD's ("gTLD's"): ".com," ".edu," ".gov," ".int," ".mil," ".net," and ".org." (Strawn Decl. ¶ 20.)[4] A complete Internet domain name consists of groups of alphanumeric characters, each known as a string, separated by a period, which is known and pronounced as "dot." The last string-the farthest to the right-is a TLD. (Graves Decl. ¶ 13.) Thus, for example, the Internet site for the Southern District of New York can be found at "usdcsdny.gov," and the domain name of National Public Radio is "npr.org." Each string can be up to 63 characters in length, but the overall domain name can be no longer than 255 characters. (Strawn Decl. ¶ 18.) There are approximately 2.4 million domain names with the .com TLD but less than 400,000 with .org, .net, .edu, and .gov combined. (Strawn Decl. ¶ 40.)

Computers on the Internet do not actually find each other using domain names like usdcsdny.gov. Instead, they use a number known as an Internet Protocol or IP number. Each entity connected to the Internet has one or more unique IP numbers, separated by periods; the overall IP

1. Plaintiff originally filed a motion for a preliminary injunction on May 14, 1998. On May 27, 1998, with the consent of the parties, the Court ordered that the motion be deemed a motion for partial summary judgment.

2. As set forth in the Background section, on September 9, 1998, the NSF transferred responsibility for matters at issue in this lawsuit to the Department of Commerce. The real party in interest is of course the Federal Government.

3. Another limitation may be the law governing protection of trademarks. *See, e.g., Planned Parenthood Federation of America, Inc. v. Bucci,* No. 97 Civ. 629, 1997 WL 133313, 42 U.S.P.Q.2d 1430 (S.D.N.Y.1997); *aff'd,* 152 F.3d 920, 1998 WL 336163 (2d Cir.); *cert. denied,* —— U.S. ——, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998).

4. There are also approximately 240 country code TLD's ("ccTLD's"), also known as "ISO 3166 TLD's." (Holtzman Decl. Ex. A; Strawn Decl. ¶ 20.)

number can be no longer than 12 digits. (Strawn ¶ 13.) When the Internet was first developing, the IP numbers were assigned and maintained by the late Dr. Jon Postel at the University of Southern California; this effort later became known as the Internet Assigned Numbers Authority ("IANA"), which still allocates IP numbers today. (Strawn Decl. ¶ 14.) Postel took on this task when he was a graduate student at UCLA, pursuant to a contract between the Defense Department's Defense Advanced Research Projects Agency ("DARPA") and UCLA. *Management of Internet Names and Addresses,* 62 Fed. Reg. 31741 (1998). In 1987, the Internet community agreed on a new protocol, announced in Request for Comments ("RFC") 1034, dated November 1987 and written by one P. Mockapetris. (Strawn Decl. Ex. B)[5], for associating named addresses with IP numbers so that users would not have to remember strings of numbers but could use words instead.[6] For example, the Southern District of New York Internet site can also be found by its IP number, 156.121.20.201.

The protocol announced in RFC 1034 is known as the Domain Name System ("DNS"). (Strawn Decl. ¶ 16.) DNS is a hierarchical tree structure (Strawn Decl. Ex. B §§ 3.1–3.3) and uses a distributed database. (Strawn Decl. ¶ 19.) That database is initiated by "root servers." When a user types a domain name such as "usdcsdny .gov," his computer must first match that domain name to its associated IP number in order to locate the Southern District's Internet site in cyberspace. The computer attempts to match the domain name to the IP number by sending out a an address query. The matching of an IP number to a domain name is known as DNS name resolution. (Strawn Decl. ¶ 25.) The match information (for example, that "usdcsdny.gov" can be found at 156.121.20.201) is stored on various Internet-connected computers around the world known as domain name servers. Thus, the goal of the address query is to find the particular domain name server which contains the match information the user is looking for. (Strawn Decl. ¶ 19.)

Address inquiries are processed hierarchically beginning with the TLD. The highest level of the DNS database is the root zone file, which directs a query to the TLD zone file, which contains information regarding the location of gTLD's and the ccTLD's. In the case of someone search-

5. RFC's are formal memos produced by members of the Internet Engineering Task Force ("IETF"). The IETF is a "loosely self-organized group of people who make technical and other contributions to the engineering and evolution of the Internet and its technologies. It is the principal body engaged in the development of new Internet standard specifications." (Strawn Decl. Ex. A.) As there is no centralized authority that controls the Internet, the Internet's smooth functioning depends on the cooperation and consensus of its users, and IETF represents an effort to meet that goal. The situation is well summarized in NSI's 1997 S–1 filing with the SEC:

> The effective operation of the Internet is dependent on the continued mutual cooperation and consensus among an increasing number of entities, many of which have widely divergent interests...Continuing to achieve consensus may become difficult or impossible and may become extremely time-consuming and costly. Achieving consensus may be made more difficult because

of the lack of leadership by any one entity. This lack of regulation also creates great uncertainty as to the legality of any action, making business planning and operations difficult. Conversely, the lack of regulation could theoretically result in individuals and entities taking harmful or disruptive actions with respect to the Internet with impunity. There is a risk that a failure to achieve consensus among the various groups which are now informally administering the Internet could result in the disruption of Internet operations, the inability of any user to communicate with another user or otherwise use the Internet or the delay of infrastructure improvements necessary to the maintenance and expansion of the Internet.

(Manishin Decl. Ex. 5 at 11.)

6. Prior to RFC 1034, network users had been using alphanumeric domain names in addition to IP numbers, but the load on the network was considerable given the horizontal nature of the naming protocol. (Strawn Decl. Ex. B § 2.1.)

ing for "usdcsdny.gov," the root zone file will refer the query to a TLD zone file containing information about .gov domain names.[7] The .gov zone file then refers the query to a second level domain ("SLD") file which contains all the SLD entries under .gov. (Strawn Decl. ¶ 20–21.) This is where the usdcsdny.gov query ends: the SLD file has the information matching the domain name to the IP number. With the IP number, the user's computer can now connect him to the requested Internet location. The Southern District's home page will appear, just as if the user had typed in the IP number instead of the alphanumeric address.

A new user who wishes to have an Internet site with an alphanumeric address first must obtain an IP number from IANA or a registry or Internet Service Provider ("ISP") that has already obtained a block of IP numbers from IANA. (Strawn Decl. ¶ 23; Manishin Decl. Ex. 5 at 11.) For example, she may receive the IP number 1.23.456.7. She then registers her domain name-say, "judicial-lawclerks.com"-and it becomes associated with her IP number.[8] The information that judical-lawclerks.com can be found at 1.23.456.7 goes on the "A root server." There are a total of 13 root zone files in the Internet, named A through M; servers B through M download new domain name registration information on a voluntary[9] and daily basis

from the A server. (Strawn Decl. ¶ 26; Holtzman Decl. ¶ 8; Graves Decl. ¶ 29.)[10] In this way, no matter which root zone file a user's computer utilizes to begin an address query, the query can be completed successfully-in other words, the domain name is successfully resolved. (Strawn Decl. ¶ 26.)

The issue at the heart of this case is who handles the registration of new domain names and places the information regarding new registrations on the A root server each day. The current registrar for new domain names under the .com, .org, .net, and .edu TLD's is NSI. (Graves Decl. ¶ 16.) NSI has provided these registration services since 1993 pursuant to a Cooperative Agreement with the NSF. (Strawn Decl. Ex. F.) Pursuant to Amendment 4 to the Cooperative Agreement, NSI charges $100 to register a domain name for a two year period and $50 a year thereafter. Of the funds NSI collects from these charges, it keeps 70 percent; the remaining 30 percent is "placed into an interest-bearing account which will be used for the preservation and enhancement of the 'Intellectual Infrastructure' of the Internet in general conformance with approved Program Plans." (Cooperative Agreement, Amendment 4 (dated September 13, 1995), Strawn Decl. Ex. F.) As noted above, there are almost three million domain names

---

**7.** This is somewhat analogous to the United States Postal Service's system of ZIP codes or the system of telephone area codes. ZIP codes are five digits (excluding the "+4" add-on), and the first three digits generally correspond to a particular county. For example, ZIP codes beginning with "105" are associated with post offices in Westchester and Putnam Counties, New York. Thus, if one saw the "10528" ZIP code and wondered what town it was for, one could narrow the search to a list of towns in Westchester and Putnam Counties. In this case, 10528 is the ZIP code for Harrison, New York.

**8.** Based on a test search run March 3, 1999, neither the IP number 1.23.456.7 nor the domain name judiciallawclerks.com appears to be registered.

**9.** According to PGM's president, NSI "controls the root server and updates servers around the globe on a daily basis." (Garrin Decl. ¶ 7.) This is not necessarily inconsistent with the defendants' claim that the managers of the other servers voluntarily download new registration information from the root server on a daily basis.

**10.** Ten of the 13 root servers are located in the U.S. In addition to A. J is also maintained by NSI. E, G, and H are run or funded by the Government. B, D, and L are at universities and receive significant Federal funding. C and F are maintained by private companies, Performance Systems International, Inc. of Troy, NY, and Internet Software Consortium of Palo Alto, CA, respectively. I is in Sweden, K is in London, and M is in Japan. (Strawn Decl. ¶¶ 41–44; Holtzman Decl. Ex. B.)

currently registered under the four TLD's for which NSI handles the registration.

To understand how NSI became the registrar of certain TLD's, it is necessary to understand the history and development of the Internet. Before the Internet, there were two networks known as AR-PANET and NSFNET. (Strawn Decl. ¶ 5.) The entities who used these networks were research oriented organizations-mostly within government, business, and academia. ARPANET users engaged in military research and received funding from the Defense Department ("DOD") and like agencies, while NSFNET users included ARPANET users plus scientific researchers receiving funding from NSF, other Federal agencies, universities, and corporations. (*Id.*) By 1995, those networks had generally been known as the Internet. (*Id.* ¶ 6.) The IP numbering system was established in 1983 as part of a network system software called Transmission Control Protocol/Internet Protocol ("TCP/IP"). (*Id.* ¶¶ 6, 13.) The NSF supported many of the original technical studies that developed the Internet Protocol. (Pl.'s 56.1 Stmnt. ¶ 7.) Over time, more and more institutions and sites desired to be connected to the network (*Id.* ¶ 8.) and those that did connect were required to operate in accordance with TCP/IP and other consensus-based network standards. (*Id.* ¶ 10.) The Internet Engineering Task Force (*supra*, note 5) began in 1986 and received NSF support. (*Id.* ¶ 11.)

Assignment of IP numbers and registration of domain names was initially the responsibility of IANA. (*Id.* ¶ 27.) The actual registrations were conducted by the Defense Information Systems Agency Network Information Center, operated by a military contractor. (*Id.*) In the late 1980's, NSF began to support registration services for the non-military network. (*Id.* ¶ 28.) From 1987 to 1991 IANA had a DOD contract to handle registration of IP numbers and domain names, with the actual registrations performed by SRI (until 1990) and Government Systems Incorpo-

rated ("GSI") (1991–1992); GSI subcontracted with NSI in March 1991 to perform the actual registrations. (*Id.* ¶ 29.)

On March 19, 1992, NSF solicited competitive proposals for three network information service managers: one to provide registration services for the non-military Internet; one to serve as a central directory and database service; and one to serve as an information service assisting new entities joining the Internet. (*Id.* ¶ 31.) The solicitation was issued pursuant to the National Science Foundation Act of 1950, 42 U.S.C. § 1861 *et seq.*, as amended, and the Federal Cooperative Agreement Act, 31 U.S.C. § 6305. (Strawn Decl. Ex. D § I.)

NSI's bid to provide registration services was selected by NSF. On January 1, 1993, Cooperative Agreement No. NCR–9218742 ("the Cooperative Agreement") between NSF and NSI went into effect. Under its terms it was to expire September 30, 1998. (Strawn Decl. Ex. F.) Among other provisions, the Cooperative Agreement provided that:

> [NSI] has primary responsibility for ensuring the quality, timeliness and effective management of the registration services provided under this agreement. To the extent that NSF does not reserve specific responsibility for accomplishing the purposes of this Agreement, by either special condition or general condition of this Agreement, all such responsibilities remain with [NSI].

> NSF has responsibility for registration services support, support planning, oversight, monitoring, and evaluation. NSF will make approvals required under the General Conditions and, where necessary and appropriate, NSF will contact and negotiate with Federal agencies and other national and International members of the Internet community to further the efforts of this project.

(*Id.* Art.'s 6(A), 6(B)(1).) Under the Cooperative Agreement, NSI became the registrar for the .com, .org, .net, .edu, and .gov TLD's; IANA continued its role as over-

seer of the allocation of IP numbers and domain name registrations. (Strawn Decl. ¶ 36.)

A March 1994 RFC by Jon Postel noted that IANA was responsible for the overall coordination and management of the DNS, and

> especially the delegation of portions of the name space called the top level domains. Most of these top-level domains are two letter country codes taken from the ISO standard 3166.

> A central Internet Registry (IR) has been selected and designated to handled [sic] the bulk of the day-to-day administration of the Domain Name System. Applications for new top-level domains (for example, country code domains) are handled by the IR with consultation with the IANA.

(Strawn Decl. Ex. H (RFC 1591) ¶ 3.) An August 1990 RFC, number 1174, specifically contemplated that the IR would serve as the centralized registration database:

> The IR would continue to be the principal registry for all network and autonomous system numbers. It would also continue to maintain the list of root Domain Name System servers and a database of registered nets and autonomous systems.

> In addition, however, the IR would also allocate to organizations approved by the Coordinating Committee for all Interncontinental Research Networking (CCIRN) blocks of network and autonomous system numbers, as needed, and delegate to them further assignment authority.

> It is recommended that, at least initially, the IR serve as the default registry in cases where no delegated registration authority has been identified.

> Copies of the aggregate Internet registration database(s) should be maintained by the IR and copies provided to each delegated registry to improve redundancy and access to this information. Updates to the database, however, would still be centralized at the IR with complete copies redistributed by file transfer or other means on a timely basis.

(Strawn Decl. Ex. G (RFC 1174) ¶ 1.3.)

The Cooperative Agreement specifically required NSI to "provide registration services in accordance with the provisions of RFC 1174." (Strawn Decl. Ex. F, Art. 3(C).)

In July 1996, PGM established its own network of 13 name servers to provide a domain name registry in competition with NSI's. (Garrin Decl. ¶ 9.) PGM has begun to accept domain name registrations under approximately 530 new gTLD's. (*Id.* ¶¶ 15, 20.) Some of these gTLD's are forpresident, formayor, and computers. (*Id.* ¶ 9.) According to PGM, its name servers are in compliance with all existing industry standards and protocols, but domain names registered under PGM's gTLD's are not universally resolvable. (*Id.* ¶ 12.) This is because they are not listed in the root zone files. (*Id.*) If NSI were to amend the root file on the A server to include PGM's gTLD's and the domain names PGM registers thereunder, then the root zone files on the other 12 root servers would receive the updated information and end users who typed in a forpreseident address would be connected to that forpresident address. But when the root servers do not recognize a top level domain name, the domain address cannot be resolved and the connection fails. (*Id.* ¶ 8.) In the words of the Commerce Department's National Telecommunication Information and Administration's ("NTIA") June 6, 1998 policy statement, "Universal name consistency on the Internet cannot be guaranteed without a set of authoritative and consistent roots. Without such consistency messages could not be routed with any certainty to the intended addresses." *Management of Internet Names and Addresses*, 63 Fed.Reg. 31741, 31742 (1998).

On March 11, 1997 PGM wrote to NSI requesting that NSI add PGM-registered

domain names to "the Configuration File 'named.root' running on your root name servers." (Manishin Decl. Ex. 8.) On March 12, 1997, NSI's outside general counsel responded to PGM's request. saying that NSI

> acts as only one of a number of root name server administrators, but does not "control," as you put it, which data is input ·and resolved. Network Solutions, along with all of the other root server administrators located around the United States and in Sweden, takes ·its direction from, and is under the authority of, the Internet Assigned Numbers Authority (IANA), located at the University of Southern California.
>
> We, therefore, must decline to comply with your demand. We have, however, sent the original of your correspondence on to the IANA for its information and consideration.

(Manishin Decl. Ex. 9.)

On March 20, 1997, PGM filed its initial complaint in this action, naming NSI as the sole defendant, charging antitrust violations, and naming IANA as a non-party co-conspirator. (Compl.¶ 5.) On March 27, 1997, NSI's counsel wrote to Jon Postel at IANA to seek confirmation that what NSI had told PGM in response to PGM's March 11, 1997 letter was correct, i.e., that "NSI maintains the information on that root-server under the authority and at the direction of the IANA and NSI can only make changes to the Configuration File at the direction of IANA." (Manashin Decl. Ex. 10.) On April 4, 1997, the general counsel of the University of Southern California [11] responded to NSI's March 27, 1997 letter stating:

> The statement made in your letter concerning the relationship between the Internet Assigned Numbers Authority ("IANA") and Network Solutions, Inc. ("NSI") is not correct. We are aware of no contract or other agreement that gives IANA authority over your client's operations. The IANA has no authority to establish a generic top level domain ("gTLD") without an Internet community consensus arrived at through committee review and ample opportunity for public impact. Instead, the restriction in expansion of gTLD's has thus far been due to consensus which your client has chosen to accept in refusing requests from potential registrars of new gTLDs.

(Manashin Decl. Ex. 11.)

On June 10, 1997, NSI's Internet business manager, David Graves, wrote to Don Mitchell, Cognizant Program Official for the NSF"'s Network and Communication Division, expressing concern over PGM's suit and other potential litigation over the TLD registration issue.

> Network Solutions finds itself in the difficult position of defending against antitrust claims that its server is an "essential facility" for Internet commerce, while at the same time privately and publicly supporting the addition of more TLDs to enhance competition. Further, Network Solutions must defend itself without any certainty as to whether it has the authority to accept or reject demands, such as PGMedia's, for the inclusion of additional TLDs. There are no technological restrictions or impediments to the inclusion of additional TLDs to our root zone file. Network Solutions has no interest in being the target of such actions, and, I am certain, the NSF does not want to become one either. In the absence of action, the number of lawsuits will likely increase as more demands for the inclusion of additional TLDs are received.
>
> Network Solutions has in the past reviewed and forwarded requests for new TLDs to the IANA. With few exceptions, the TLDs, however, were for new

---

**11.** Dr. Postel was employed at this time by the University of Southern California., ·where he

ran IANA.

country code designations. Network Solutions consulted with the IANA before including those TLDs on our root zone file. However, in the face of the IANA's unwillingness or inability to accept any responsibility, and the impending legal threats, it appears that the decision process will be limited at least initially to Network Solutions operating in a responsible manner with NSF concurrence. We envision that the administration of Internet top level domains will need to be conducted in this manner during the Cooperative Agreement, while the future governance issues of the Internet evolve and mature.

Under the above circumstances, we believe that additional TLDs should be included on our root zone file. We also believe that the addition of new TLDs will be beneficial to a more competitive environment and desirable for a further commercialization of Internet registration services at this time. Accordingly, it is our intention to announce publicly that on July 15, 1997 Network Solutions will begin accepting applications to include new TLDs on the root zone file from PGMedia, Iperdome, and other interested parties.

By this letter, we seek NSF's concurrence in this action, and respectfully request your response no later than June 25, 1997, to allow us sufficient time to finalize our plan and to report to the Federal Court in the PGMedia suit. Network Solutions believes that it is imperative to proceed with the public announcement of this plan, and urges NSF's prompt consideration of an concurrence on the implementation process.

(Manashin Decl. Ex. 12.)

The NSF responded on June 25, 1997, and refused to concur in NSI's proposal:

We appreciate the current and potential litigation burdens described in your letter and understand NSI's need to respond to the antitrust claims filed against it.

As you are aware, the National Science Foundation is currently discussing with several federal agencies many of the governance and authority issues raised in your letter. We expect that these discussions will lead to greater stability of the Internet, especially since NSF has no plans to renew or to recomplete the Cooperative Agreement with NSI when it ends in March 1998. However, no conclusions have as yet been reached with respect to the future of the Domain Name System or the creation of new TLDs, and it is generally felt that the addition of any new TLDs at this time would be destabilizing and premature.

Based on the above, I am unable to concur with your proposed plan and process at the present time and must reject your request. The National Science Foundation also specifically requests that NSI take NO action to create additional TLDs or to add any other new TLDs to the Internet root zone file until NSF, in consultation with other U.S. government agencies, has completed its deliberations in this area and is able to provide further guidance.

(Manashin Decl. Ex. 13.)

On August 11, 1997, in response to a request by NSI for clarification of NSF's June 25, 1997 letter, NSF wrote:

You asked whether this was intended to be a directive under the captioned cooperative agreement or merely a request by the Foundation that NSI refrain from adding new Top Level Domains at this time. It was the former.

Under the cooperative agreement, NSI is responsible for the quality, timeliness, and effective management of the registration services and, I should say, has done a remarkable job considering the unanticipated explosive growth of the Internet community. The Foundation and NSI agreed that new TLDs would be added only in accordance with Request for Comments 1591. (RFC 1591, of course, is the successor to RFC

1174, which was invoked by paragraph C in the cooperative agreement's Statement of Work.) For NSI to act unilaterally in this regard is inconsistent with the terms of the agreement, since such unilateral action would be a significant project change, as defined in article 8 of the Foundation's Grant General Conditions [GC–1(5/94)], which is referenced in Article 6.B2b(2) of the cooperative agreement as modified by Amendment 01.

As I indicated in my previous letter, NSF is currently discussing with several Federal agencies many of the governance and authority issues raised by David M. Graves' June 10, 1997 request that NSI be allowed to create additional TLDs. As part of that effort, the National Telecommunications and Information Administration of the Department of Commerce on July 2, 1997 solicited public comments on Registration and Administration of Internet Domain Names [62 Fed.Reg. 35896 (1997)] with a response deadline of August 18, 1997. Addition of any new TLDs in the midst of this national policy formulation would be at best premature and at worst destabilizing. Consequently, the Foundation will not approve such action.

(Manashin Decl. Ex. 15.)

On September 11, 1997, PGM filed a second amended complaint.[12] The second amended complaint added NSF as a defendant, charged NSF with violating PGM's rights under the First Amendment, and added a Count VI in which PGM seeks declaratory judgment against both defendants.

Meanwhile, as the NSF indicated in its letters to NSI, various Federal agencies were working together to study domain name problems. (Strawn Decl. ¶ 46.) On July 1, 1997, "as part of the Clinton Administration's *Framework for Global Electronic Commerce,* the President directed the Secretary of Commerce to privatize the domain name system (DNS) in a manner that increases competition and facilitates international participation in its management." (NSI Ex. 10.) On July 2, 1997 NTIA issued a request for public comments on "the current and future system(s) for the registration of Internet domain names." *Request for Comments on the Registration and Administration of Internet Domain Names,* 62 Fed.Reg. 35896 (1997).

The enormous growth and commercialization of the Internet has raised numerous questions about current domain name registration systems. In addition, the present system will likely undergo modification when the National Science Foundation's Cooperative Agreement (NSF Agreement) with Network Solutions Inc. to register and administer second-level domains for three top-level domains expires in 1998. Resolution of these issues will also affect the future operation of the National Information Infrastructure (NII) and the Global Information Infrastructure (GII).

The United States Government played a central role in the initial development, deployment, and operation of domain name registration systems, and through the NSF agreement as well as Defense Advanced Research Projects Agency (ARPA) agreement(s) continues to play a role. In recent years, however, Internet expansion has been driven primarily by consensus rather than by government regulation. Many believe that the Internet's decentralized structure accounts at least in part for its rapid growth.

The Government has supported the privatization and commercialization of the Internet through actions such as the transition from the NSFNET backbone to commercial backbones. The Government supports continued private sector leadership for the Internet and believes that the transition to private sector control should continue. The stability of the Internet depends on a fully intercon-

---

12. A first amended complaint was filed April 3, 1997.

nected and interoperable domain name system that must be preserved during any transition.

Various private sector groups have proposed systems for allocating and managing generic top level domains (gTLDs). The Government is studying the proposals and the underlying issues to determine what role, if any, it should play. The Government has not endorsed any plan at this time but believes that it is very important to reach consensus on these policy issues as soon as possible.

The United States Government seeks the views of the public regarding these proposals and broader policy issues as well.

*Id.* Over 430 comments were received. (NSI Ex. 10.) On February 20, 1998, NTIA published a proposed rule. *Improvement of Technical Management of Internet Names and Addresses,* 63 Fed. Reg. 8826 (1998). The proposed rule called for the transfer of Internet DNS management to a private not-for-profit corporation but proposed that during the transition period that five new gTLD's be added to the DNS. *Id.* at 8829, 8831.

Management of number addresses is best done on a coordinated basis. As technology evolves, changes may be needed in the number allocation system, these changes should also be undertaken in a coordinated fashion.

Similarly, coordination of the root server network is necessary if the whole system is to work smoothly. While day-to-day operational tasks, such as the actual operation and maintenance of the Internet root servers, can be contracted out, overall policy guidance and control of the TLDs and the Internet root server system should be vested in a single organization that is representative of Internet users.

Finally, coordinated maintenance and dissemination of the protocol parameters for Internet addressing will best pre-serve the stability and interconnectivity of the Internet.

We propose the creation of a private, not-for-profit corporation (the new corporation) to manage the coordinated functions in a stable and open institutional framework. The new corporation should operate as a private entity for the benefit of the Internet as a whole. The new corporation would have the following authority:

1. To set policy for and direct the allocation of number blocks to regional number registries for the assignment of Internet addresses;

2. To oversee the operation of an authoritative root server system;

3. To oversee policy for determining, based on objective criteria clearly established in the new organization's charter, the circumstances under which new top-level domains are added to the root system; and

4. To coordinate the development of other technical protocol parameters as needed to maintain universal connectivity on the Internet.

The U.S. government would gradually transfer existing IANA functions, the root system and the appropriate databases to this new not-for-profit corporation. This transition would commence as soon as possible, with operational responsibility moved to the new entity by September 30, 1998. The U.S. government would participate in policy oversight to assure stability until the new corporation is established and stable, phasing out as soon as possible and in no event later than September 30, 2000. The U.S. Department of Commerce will coordinate the U.S. government policy role. In proposing these dates, we are trying to balance concerns about a premature U.S. government exit that turns the domain name system over to a new and untested entity against the concern

that the U.S. government will never relinquish its current management role.

*Id.* at 8827–28.

Over 650 comments were received in response to the proposed rule. *Management of Internet Names and Addresses,* 63 Fed.Reg. 31741 (1998). On June 10, 1998, having considered those responses, NTIA published a statement of policy in the Federal Register. *Id.* The policy reiterated the DOC's desire to shift DNS management to the auspices of a non-profit corporation. The goal was to have the corporation carry out its operational responsibility by October 1998, with the DOC gradually phasing out until the transition would be complete by September 30, 2000. *Id.* at 31744. One change made in the policy statement from the proposed rule was that the DOC would not implement any new gTLD's during the transition to the new non-profit corporation. *Id.* at 31746.

On September 9, 1998, NSF and DOC entered into a Memorandum of Agreement pursuant to which NSF transferred responsibility for administering its Cooperative Agreement with NSI to DOC. This was done "to ensure the seamless and stable transition from the existing framework of Internet administration to a private sector management structure as set forth in the statement of policy." (January 12, 1999 Stipulation Ex. A.) On October 6, 1998, NSI and DOC extended the Cooperative Agreement to September 30, 2000 at the latest by agreeing to "Amendment No. 11." Amendment No. 11 provided for NSI's recognition of the new non-profit corporation described in the June 10, 1998 Statement of Policy ("NewCo"); authorized NSI's continued operation of the primary root server during the transition to NewCo; and provided for "the development, deployment and licensing by NSI of a mechanism that allows multiple registrars to accept registrations for the [gTLD's] for which NSI acts as a registry." (January 12, 1999 Stipulation Ex. B.) Amendment No. 11 also provides:

NSI agrees to continue to function as the administrator for the primary root server for the root server system and as a root zone administrator until such time as the [DOC] instructs NSI in writing to transfer either or both of these functions to NewCo or a specified alternative entity.

While NSI continues to operate the primary root server, it shall request written direction from an authorized [DOC] official before making or rejecting any modifications, additions or deletions to the root zone file. Such direction will be provided within ten (10) working days and it may instruct NSI to process any such changes directed by NewCo when submitted to NSI in conformity with written procedures established by NewCo and recognized by the [DOC].

*(Id.)*

In the fall of 1998, the Internet Corporation for Assigned Names and Numbers ("ICANN") was incorporated as a nonprofit public benefit corporation in California; its revised Articles of Incorporation were filed November 21, 1998. (January 12, 1999 Stipulation ¶ 4; Ex. C.) ICANN's bylaws were adopted November 23, 1998. *(Id.* Ex. D.) On November 25, 1998, DOC and ICANN entered a Memorandum of Understanding, pursuant to which they agreed to

jointly design, develop, and test the mechanisms, methods, and procedures that should be in place and the steps necessary to transition management responsibility for DNS functions now preformed by, or on behalf of, the U.S. Government to a private-sector not-for-profit entity. Once testing is successfully completed, it is contemplated that management of the DNS will be transitioned to the mechanisms, methods, and procedures designed and developed in the DNS project.

*(Id.* Ex. E, Art. II(B).) ICANN agreed to "[c]ollaborate on the design, development and testing of a plan for creating a process

**400**

that will consider the possible expansion of the number of gTLD's." (*Id.* Art. V(C)(9).)

On December 17, 1998, the Court ordered supplemental briefings on the questions of whether, in light of the incorporation of ICANN and the Memorandum of Understanding between ICANN and DOC, (1) this action is now moot; and (2) if the action is not moot, whether it should be stayed, and for what duration. On January 12, 1999, PGM, NSF, and NSI filed their briefs on these questions and entered into a stipulation. That stipulation provided that

NSF's June and August 1997 written directives to NSI, which were a subject of the parties' summary judgment briefs, are no longer relevant to the pending motions. The parties further agree that for the purposes of the pending motions:

(a) Plaintiff does not challenge the validity of the Memorandum of Agreement between the NSF and the Department of Commerce (Exhibit A hereto) or the statutory authority of the NSF and the Department of Commerce to enter into that Memorandum of Agreement;

(b) Plaintiff does not challenge the validity of Amendment No. 11 to the Cooperative Agreement (Exhibit B hereto) or the statutory authority of the Department of Commerce to enter into that Amendment with NSI. Rather, plaintiff seeks a declaration that Amendment No. 11 confers no antitrust immunity on NSI for actions taken pursuant to that Amendment;

(c) NSI acknowledges that Congress has not enacted any statute that confers express antitrust immunity with respect to NSI's activities under the Cooperative Agreement, as amended by Amendment No. 11. Rather, NSI seeks a declaration that implied antitrust immunity applies to those activities under the "federal instrumentality" doctrine; and

(d) Plaintiff challenges, under the First Amendment to the U.S. Constitu-

tion, that portion of Amendment No. 11 to the Cooperative Agreement that requires written governmental direction before changes are made to TLDs included in the Internet's root zone file.

(January 12, 1999 Stipulation ¶ 8.)

**Discussion**

I. *Standard of Review*

The Second Circuit has summarized the standards for granting summary judgment as follows:

First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. When no rational [factfinder] could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

*Gallo v. Prudential Residential Svcs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted). This motion does not present disputed factual issues so much as disputed legal issues.

II. *Plaintiff's Antitrust Claim Against NSI*

PGM claims that NSI is liable under § 2 of the Sherman Act, 15 U.S.C. § 2, because NSI has monopoly control of an essential facility which cannot be duplicat-

ed and has denied use of that essential facility to PGM despite the feasibility of doing so. *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 569 (2d Cir.1990). The essential facility is alleged to be the root zone file.

NSI acknowledges that Congress has not enacted any statute that confers express antitrust immunity with respect to NSI's activities under the Cooperative Agreement as amended by Amendment No. 11. (January 12, 1999 Stipulation ¶ 8(c).) Thus, the issue is whether NSI is entitled to some form of implied immunity. NSI argues that its activities performed under the Cooperative Agreement with NSF (and, now, with DOC, pursuant to the NSF's Memorandum of Agreement with DOC and Amendment No. 11) are immune from antitrust liability because they are performed pursuant to a contract with a federal instrumentality. Resolution in NSI's favor of its immunity defense would be dispositive of PGM's claim against NSI, so the defense is considered first.

■■■ NSI argues that because it had a contract with a federal agency-the NSF, and now DOC-the actions it has taken to comply with that contract are entitled to immunity from the antitrust laws. It first notes the long-standing proposition that the Federal Government is not a person for the purposes of liability under §§ 1 and 2 of the Sherman Act. *United States v. Cooper Corp.,* 312 U.S. 600, 607, 61 S.Ct. 742, 85 L.Ed. 1071 (1941). From there, courts have gone on to hold that agencies of the Federal Government are absolutely immune from the Sherman Act's provisions. *See Sea–Land Service, Inc. v. Alaska Railroad,* 659 F.2d 243, 246 (D.C.Cir. 1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982) ("the United States, its agencies and officials remain outside the reach of the Sherman Act"); *Jackson v. West Indian Co., Ltd.,* 944 F.Supp. 423, 425 (D.Vi.1996); *Howes Leather Co., Inc. v. Golden,* 681 F.Supp. 6, 15 (D.D.C.1987).

Moreover, private entities under contract with federal instrumentalities are immune from Sherman Act liability for their actions taken pursuant to that contract. Thus, for example, in *Sakamoto v. Duty Free Shoppers, Ltd.,* 764 F.2d 1285, 1288–89 (9th Cir.1985), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986), the Ninth Circuit considered the case of a business which had an exclusive franchise with the government of Guam to sell specified merchandise to departing travelers at the Guam airport. The court determined that the government of Guam is an instrumentality of the Federal Government and that it was immune from antitrust liability, thus affirming the district court's dismissal of the plaintiff's antitrust claims. In *Champaign–Urbana News Agency, Inc. v. J.L. Cummins News Co., Inc.,* 632 F.2d 680 (7th Cir.1980), the plaintiff, a wholesale book and magazine distributor, sued a competitor and the secretaries of the Air Force and Army, claiming that the competitor's sale of material to the Army and Air Force Exchange Service ("AAFES") violated the Robinson–Patman Amendments to the Clayton Act. The court found the AAFES is a federal instrumentality and that therefore the special discount it received on goods sold to it by Cummins did not violate Robinson–Patman. "If a particular purchase is exempt from liability under the antitrust laws, both the seller and purchaser in the transaction are exempt." *Id.* at 693.

■■ The gravamen of the federal instrumentality immunity, as applied to non-Government entities, is that a party to whom an agency of the Federal Government delegates or contracts to perform a function or provide a service is entitled to the same protections against antitrust liability as the Government agency itself. Whether the Government's immunity will also apply to the contracting party, however, depends on the extent to which the Government is acting pursuant to a clearly articulated policy or program. "Private parties acting in compliance with clearly

articulated government policies or programs are immunized from antitrust liability to the same extent as the government entity." *IT & E Overseas, Inc. v. RCA Global Communications, Inc.*, 747 F.Supp. 6, 11 (D.D.C.1990). At least two courts have stated the proposition even more broadly: " '[P]rivate parties, to the extent they are acting at the direction or with the consent of federal agencies, also fall outside the pale of the act's prohibition.' " *Agritronics Corp. v. National Dairy Herd Association, Inc.*, 914 F.Supp. 814, 820 (N.D.N.Y.1996) (quoting *Greensboro Lumber Co. v. Georgia Power Co.*, 643 F.Supp. 1345, 1365 (N.D.Ga.1986), *aff'd*, 844 F.2d 1538 (11th Cir.1988)).

■ NSI operates the A root server pursuant to a valid contract with the Government. The basic contract is the Cooperative Agreement, entered into with the NSF and effective January 1, 1993, as amended. On September 9, 1998, NSF transferred responsibility for administering the Cooperative Agreement to DOC, (January 12, 1999 Stipulation ¶ 1), and PGM does not challenge the validity of that transfer, nor does it challenge the validity of Amendment No. 11.

PGM does challenge whether NSF had the authority to contract DNS management to NSI in the first place (Pl. Repl. Mem. at 11) and whether Amendment No. 11 confers antitrust immunity on NSI for actions NSI takes thereunder. (January 12, 1999 Stipulation ¶ 8(b).) However, the Cooperative Agreement was a valid exercise of the NSF's authority under the National Science Foundation Act, 42 U.S.C. § 1861 *et seq.*, and the Federal Grant and Cooperative Agreement Act, 31 U.S.C. § 6301 *et seq.*

The National Science Foundation Act was passed in 1950 and established the NSF whose mission was, among other things,

> to initiate and support basic scientific research in the mathematical, physical, medical, biological, engineering, and other sciences, by making contracts or other arrangements (including grants, loans, and other forms of assistance) for the conduct of such basic scientific research and to appraise the impact of research upon industrial development and upon the general welfare.

National Science Foundation Act, ch. 171, 64 Stat. 149 (1950) (codified as amended at 42 U.S.C. § 1862(a)(1)). A 1968 amendment to the NSF Act authorized and directed the NSF "to foster and support the development and use of computer and other scientific methods and technologies, primarily for research and education in the sciences." 82 Stat. 360 (1968) (codified at 42 U.S.C. § 1862(a)(4)). According to the commentary of the Special Subcommittee on Science of the Committee on Labor and Public Welfare, the purpose of the amendment concerning computers was

> to permit the Foundation to carry on such activities in areas not related to science where this is necessary or desirable to assure the most effective use of computers or other methods and technologies. Thus, the word "primarily" is a term of emphasis and not of limitation...It is our understanding that extensions of NSF activities beyond scientific areas will generally be in direct "hot pursuit" of developments centered in scientific concerns, or flow directly from the unified character of the activities in question.

Act of July 18, 1968, Pub.L. No. 90–407, 1968 U.S.C.A.A.N. (82 Stat. 360) 2644, 2655.[13]

---

13. Of course, the Federal Government had been involved in computer networking well before 1968. The Defense Department established the Defense Advanced Research Projects Agency ("DARPA") in the 1950's. Out of this effort ARPANET was developed in the 1960's. *Management of Internet Names and Addresses*, 63 Fed.Reg. 31741 (1998). Jon Postel's involvement in the assignment of Internet IP numbers began because his university was contracted to do that work by DARPA. *Id.*

In keeping with this broad mission,. in the mid–1980's NSF went on to develop NSFNET. The NSF contracted with IBM, MCI, and Merit to undertake this project. *Management of Internet Names and Addresses,* 63 Fed.Reg. 31741, 31742 (1998). NSF also supported many of the original technical studies that developed the Internet Protocol. (Pl. 56.1 Stmnt. ¶ 7.) The Defense Department continued to take responsibility for the actual registration of domain names and IP numbers through the 1980's. (Strawn Decl. ¶¶ 27–29.) In the late 1980's, NSF began to support registration services for the non-military network. (*Id.* ¶ 28.)

In 1991 Congress enacted the High–Performance Computing Act, among whose purposes was to expand "Federal support for research, development, and application of high-performance computing in order to establish a high-capacity and high-speed National Research and Education Network." High–Performance Computing Act, Pub.L. No. 102–194, § 3(1)(A), 105 Stat. 1594 (1991) (codified at 15 U.S.C. § 5502). As part of this project, the NSF was directed to "provide computing and networking infrastructure support for all science and engineering disciplines, and support basic research and human resource development in all aspects of high-performance computing and advanced high-speed computer networking." *Id.* § 201(a)(1) (codified at 15 U.S.C. § 5521.)

The NSF had the authority to enter into the Cooperative Agreement with NSI and to assign the registration tasks to NSI which could otherwise have been done by NSF itself. The NSF Act itself gives the NSF broad authority to implement its mission. NSF has the authority to "do all things necessary" to carry out the NSF Act's mandate, "including, but without being limited thereto" the authority

> to enter into contracts or other arrangements, or modifications thereof, for the carrying on, by organizations or individuals in the United States and foreign

countries, including other government agencies of the United States and of foreign countries, of such scientific or engineering activities as the Foundation deems necessary to carry out the purposes of [the Act] . . .

42 U.S.C. § 1870(c).

Also, in 1992 Congress passed the Scientific and Advanced Technology Act which, among other things, amended the NSF Act to give NSF broader authority to carry out its 1968 mandate with respect to computers. The NSF was now "authorized to foster and support *access* by the research and education communities to computer networks which may be used substantially for purposes in addition to research and education in the sciences and engineering, if the additional uses will tend to increase the overall capabilities of the networks to support such research and education activities." Pub.L. 102–476, § 4, 106 Stat. 2300 (1992) (codified at 42 U.S.C. § 1862(g)) (emphasis added). By allowing the computer networks to be "used substantially for purposes in addition to research and education," Congress gave the NSF the authority to allow other activity, *i.e.,* commercial activity, on the Internet, which will permit an interplay among the research, education, and business communities on the Internet redounding to the mutual benefit of all.

Taken together, 42 U.S.C. §§ 1870(c), 1862(a)(4), and 1862(g) provide NSF clear authority to manage the DNS. The registration of domain names and control of the DNS are activities which "foster and support the development and use of computer . . . methods and technology," 42 U.S.C. § 1862(a)(4), especially considering the NSF's central role in the development of the Internet from its earliest stages. Moreover, research, education, and commercial entities "access" the computer network known as the Internet in part by registering a domain name. 42 U.S.C. § 1862(g).[14]

14. Though it has contracted management of the A root server to NSI, the Government is

The Cooperative Agreement explicitly drew on NSF's long history in Internet development and also invokes its more recent authority to develop the National Research and Education Network ("NREN").

Today more than 5,000 networks compromise the Internet. These networks link together hundreds of thousands of computers and millions of users throughout the world. The domestic, non-military portion of the Internet includes NSFNET. It also includes other federally sponsored networks such as NASA Science Internet (NSI) and Energy Sciences Network (ESnet). NFSNET, NSI, and ESnet, as well as some other networks of the Internet, are related to the National Research and Education Network (NREN) which was defined in the President's Fiscal 1992 budget and which has been authorized by the passage in December, 1991, of the High Performance Computing and Communications Act, Public Law 102–194.

The NREN is projected to evolve from a part of the Internet containing portions of NSFNET, NSI, and ESnet. This evolution will reflect the legal and technical requirements of the various sponsoring agencies. For example, NASA and DOE are mission agencies whose networks' traffic must relate to the agencies' missions. NSF, on the other hand, is chartered to support science and engineering research and education; hence NSFNET can carry all the traffic contemplated for NREN and may in fact support additional traffic as well.

. . .

It is anticipated that all registration services required during the period of this Agreement will be obtained and furnished under the terms of this Agree-

ment and that the definition and provision of these services will help facilitate the evolution of the NSFNET and the development of the NREN. References to NSFNET in this Agreement should in general be understood to include the NREN as well.

(Strawn Decl. Ex. F at 1.)

The Cooperative Agreement is a partnership between NSF and NSI that is valid under the Federal Grant and Cooperative Agreement Act, which permits Cooperative Agreements when

(1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and

(2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

31 U.S.C. § 6306. The Cooperative Agreement was entered into to carry out the public purpose of computer network development as authorized by the NSF Act, the High Performance Computing Act of 1991, and the Scientific and Advanced Technology Act of 1992, and the Cooperative Agreement clearly contemplated substantial involvement between NSF and NSI. The NSF did not contract all of its responsibilities for the DNS to NSI in the Cooperative Agreement. "NSF has responsibility for registration services support, support planning, oversight, monitoring, and evaluation. NSF will make approvals required under the

---

still responsible for maintaining three of the other 12 root servers and funds universities which run three others. (Strawn Decl. ¶¶ 41–44; Holtzman Decl. Ex. B.) NASA administers the E server; the Defense Department administers the G server; and the Army ad-

ministers the H server. The University of Southern California administers the B and L servers and the University of Maryland administers the D server. (Holtzman Decl. Ex. B.)

General Conditions and, where necessary and appropriate, NSF will contact and negotiate with Federal agencies and other national and International members of the Internet community to further the efforts of this project." (Strawn Decl. Ex. F Art. 6(B)(1).) NSI was given "primary responsibility for ensuring the quality, timeliness and effective management of the registration services provided under this agreement. To the extent that NSF does not reserve specific responsibility for accomplishing the purposes of this Agreement, by either special condition or general condition of this Agreement, all such responsibilities remain with [NSI]." (*Id.* Art. 6(A).)

PGM argues that the Cooperative Agreement does not immunize NSI's activities because NSI has discretion to determine whether or not to add new TLD's. (Pl. Mem. at 20–21.) However, that discretion was ceded to NSI by NSF in that part of the Cooperative Agreement which gave NSI "primary responsibility for ensuring the quality, timeliness and effective management of the registration services provided under this agreement." (Strawn Decl. Ex. F Art. 6(A).) Under the NSF Act, the High Performance Computing Act of 1991, and the Scientific and Advanced Technology Act of 1992, NSF itself had the discretion to add new TLD's, and it contracted with NSI to give NSI that authority. Amendment No. 11 to the Cooperative Agreement, entered into by the DOC as successor to NSF, simply took that authority back, removing NSI's discretion to add new gTLD's during the transition period to "NewCo." (January 12, 1999 Stipulation Ex. B.)[15] Because NSF and DOC would have had antitrust immunity had they run the DNS and the A root server

themselves, NSI is immune for its actions taken pursuant to a valid Cooperative Agreement, as amended. *Sakamoto v. Duty Free Shoppers, Ltd.,* 764 F.2d 1285, 1288–89 (9th Cir.1985), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986).

When it comes to future development of the Internet and the DNS, the Executive Department has an articulated policy, and Amendment No. 11 was entered into between DOC and NSI in furtherance of that policy. Beginning in March 1997, an interagency group studied domain name problems. (Strawn Decl. ¶ 46; Manishin Ex.'s 13, 15.) On July 1, 1997, President Clinton directed the Secretary of Commerce to "privatize the domain name system (DNS) in a manner that increases competition and facilitates international participation in its management." *Management of Internet Names and Addresses,* 63 Fed.Reg. 31741 (1998). On July 2, 1997, the NTIA published a request for comments on the issue. *Request for Comments in the Registration and Administration of Internet Domain Names,* 62 Fed.Reg. 35896 (1997). On February 20, 1998, NTIA issued its proposed rule calling for the transfer of Internet DNS management to a private non-profit corporation. *Improvement of Technical Management of Internet Names and Addresses,* 63 Fed.Reg. 8826 (1998). NTIA proposed adding five new gTLD's during the transition. *Id.* at 8831. After considering some 650 comments, NTIA published a Statement of Policy which adhered to the earlier proposal to transfer DNS management to a non-profit corporation but abandoned the idea of adding any gTLD's during the transition.

**15.** NSI plays but a small role in the overall running of the Internet. At the same time that NSF solicited bids for a Network Information Services Manager ("NISM") to provide registration services for the non-military Internet, it solicited proposals for NISM's to provide a central database and directory service and to serve as an information service. (Strawn Decl. ¶ 31.) The winning bidders for

the other two NISM positions, together with NSI, "developed a detailed concept and plan to provide [a] seamless interface called the 'INTERNIC.' have reviewed their proposals to reflect the implementation of this 'INTERNIC' concept, and have agreed to the structuring of their three (separate) awards as one collaborative project." (Strawn Decl. Ex. F at 1.)

The challenge of deciding policy for the addition of new domain names will be formidable. We agree with the many commentators who said that the new corporation would be the most appropriate body to make these decision based on global input. Accordingly, as supported by the preponderance of comments, the U.S. Government will not implement new gTLD's at this time.

*Management of Internet Names and Addresses,* 63. Fed.Reg. 31741, 31746 (1998.) The overall proposal was in keeping with the Government's stated policy to allow the DNS to evolve in an environment of stability, competition, private bottom-up coordination, and representation. *Id.* at 31743.

The Department of Commerce has noted that much of the development and technical management of the Internet has been by the consensus of Internet users. *Request for Public Comment,* 62 Fed.Reg. 35896 (1997). This is evidenced, for example, by IETF and the more than 2000 RFC's which have been written and circulated. The NSF and DOC have supported that ethos. For instance, the NSF–NSI Cooperative Agreement .stated that NSI must "provide registration services in accordance with the provisions of RFC 1174." (Strawn Decl. Ex. F Art. 3(C).) The Government, having been instrumental in supporting and fostering the development of the Internet and the Domain Name System, now has adopted a clearly articulated policy of getting out of the way in the future and letting the consensus of the Internet community, as articulated through the new ICANN, govern this powerful yet fragile technology. Since it is not entirely clear how the policy will be implemented, it would be inappropriate for this Court to take any action which might interfere with the future steps the DOC may or may not take.

Two other district courts have provided federal instrumentality immunity to NSI with respect to its domain name registration activity. In *Thomas v. Network Solutions, Inc.,* 2 F.Supp.2d 22 (D.D.C.1998), the plaintiffs challenged the fee NSI collected pursuant to Amendment No. 4 to the Cooperative Agreement to register domain names. Plaintiffs claimed, among other things, that NSI was operating an illegal monopoly in violation of the Sherman Act. The court concluded, "Plaintiffs make reasonable allegations that NSI is a monopolist, but the monopoly results from the Agreement between [NSF and NSI]. Because NSI is acting in compliance with a government cooperative agreement, therefore, it is entitled to immunity from suit under the Sherman Act." *Id.* at 38. *Beverly v. Network Solutions, Inc.,* No. C–98–0337–VRW, 1998 WL 320829 (N.D.Cal. June 12, 1998), involved a plaintiff whose application for a particular domain name was rejected by NSI because NSI had received a complaint from a third party that the plaintiff's proposed domain name infringed on the third . party's federally registered mark. Among other claims, the plaintiff claimed that NSI's monopoly on domain names violates the antitrust laws. After noting that NSF is immune from antitrust liability, the court concluded that "[w]hile NSI is not a government agency, it too is immune from antitrust liability. This is so because private parties acting in compliance with a clearly articulated government program are immune from such liability." *Id.* at *3.

· PGM argues that it does not challenge the lawfulness of NSI's monopoly over domain name registrations under 15 U.S.C. § 1, but only the way NSI allegedly uses its monopoly power to maintain that power, in violation of 15 U.S.C. § 2. (Pl. Repl. Mem. at 23.) However, the federal instrumentality immunity doctrine-distinct from the more limited state action and regulatory activity doctrine cases PGM cites [16]-

16. *Strobl v. New York Mercantile Exchange,* 768 F.2d 22, 26 (2d Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985), relied on heavily by PGM, did not involve a contract between a government agency and a private party. And while it is

immunizes NSI against § 2 liability as well as against § 1 liability. The doctrine protects the *actions* of the monopolist as well as the monopoly itself. Private parties *"acting* in compliance with a clearly articulated government program," *Beverly,* 1998 WL 320829 at *3, *Thomas,* 2 F.Supp.2d at 38, or *"acting* at the direction or with the consent of federal agencies," *Agritronics* at 820, are immune from antitrust liability. (Emphasis added.)[17]

Thus, NSI is entitled to antitrust immunity for its actions taken pursuant to the Cooperative Agreement, as amended. For this reason it is unnecessary to analyze plaintiff's claims that NSI has monopoly control of an essential facility.

III. *Plaintiff's First Amendment Claim Against NSF*

▪ PGM also challenges "that portion of Amendment No. 11 to the Cooperative Agreement that requires written governmental direction before changes are made to TLDs included in the Internet's root zone file." (January 12, 1999 Stipulation ¶ 8(d).) It claims that that part of Amendment No. 11 is a prior restraint of protected speech in violation of the First Amendment to the U.S. Constitution. The Government has cross-moved for summary judgment arguing that PGM has suffered no constitutionally significant infringement of protected speech.

PGM's motion is denied, and the Government's cross-motion is granted, because the "speech" plaintiff asserts is infringed under Amendment No. 11 is not speech at all. As the Supreme Court has said, "[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive. In the absence of a showing that such a rule is necessary to protect vital First Amendment interests, we decline to deviate from the general rule that one seeking relief bears the burden of demonstrating that he is entitled to it." *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 n. 3, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). PGM has not met the burden of demonstrating that the three letter top level domain portion of an Internet domain name is expressive speech.

Internet alphanumeric addresses are not speech but are "rather like a telephone number." *Reno v. ACLU,* 521 U.S. 844, 117 S.Ct. 2329, 2335, 138 L.Ed.2d 874 (1997) (quoting district court opinion). As plaintiff's president said, "[W]hat 1–800–FLOWERS did for phone numbers, pgMedia did for the Internet." (Garrin Decl. ¶ 11.) "Internet domain names are similar to telephone number mnemonics, but they are of greater importance, since there is no satisfactory Internet equivalent to a telephone company white pages or directory assistance, and domain names can often be guessed." *MTV Networks v. Curry,* 867 F.Supp. 202, 204 n. 2 (S.D.N.Y.1994).

PGM asserts that domain names are entitled to constitutional protection, but the case it cites for that proposition in fact stands for the opposite conclusion. In *Planned Parenthood Federation of America, Inc. v. Bucci,* No. 97 Civ. 629,

---

true that the Supreme Court has said that contracting officers of the Federal Government do not have the power to grant antitrust immunity, it has also said that contracts between federal agencies and private parties "stand on their own footing and are valid or not, depending on the statutory framework within which the federal agency operates." *Otter Tail Power Co. v. United States,* 410 U.S. 366, 378–79, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). The contract between NSF and NSI stands on its own and is valid.

17. Moreover, the Supreme Court, in the original decision from which the federal instrumentality immunity doctrine emanates, did not distinguish between §§ 1 and 2 of the Sherman Act when it declared that the United States is not a person. *United States v. Cooper Corp.,* 312 U.S. 600. 606–07, 61 S.Ct. 742, 85 L.Ed. 1071 (1941).

1997 WL 133313, 42 U.S.P.Q.2d 1430 (S.D.N.Y.1997), *aff'd*, 152 F.3d 920, 1998 WL 336163 (2d Cir.), *cert. denied*, — U.S. ——, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998), Judge Wood considered a First Amendment defense to a claim of trademark infringement. In that case the defendant registered the domain name "plannedparenthood.com" and the plaintiff moved for a preliminary injunction pursuant to the Lanham Act. "[Defendant's] use of 'plannedparenthood.com' as a domain name to identify his web site is on its face more analogous to source identification than to a communicative message; in essence, the name identifies the web site, which contains defendant's home page." *Id.* at *11.

PGM argues that its new gTLD's have an expressive purpose because they include core political speech and personal expression. However, Amendment No. 11 does not infringe on the use of the string ".forpresident" in a domain name; it can currently be used as a second level domain behind the top level domain ".com." The same is true of the string "beyondhope" which is asserted to be an example of personal expression; it can be ".beyondhope.com." PGM contends that forcing it to add one of the currently available gTLD's to its preferred domain name constitutes compelled speech. (Pl. Repl. Mem. at 27.) However, if a domain name is like a telephone number mnemonic, then the TLD is like the 1–800 or 1–888 prefix (or any other area code). Far from being compelled communicative speech, the TLD is simply a routing instruction that helps computers find each other.

Moreover, there does not appear to be a requirement that a computer user wishing to establish an Internet site have a domain name at all. This is because domain names serve the sole purpose of making it easier for users to navigate the Internet; the real networking is done through the IP numbers. A user obtains an IP number from an Internet service provider. (Manashin Decl. Ex. 5 at 11.) Then, if he chooses, he may register that IP number-linked to a domain name-with NSI.

Thus, Amendment No. 11 does not violate the First Amendment.

### Conclusion

For the foregoing reasons, PGM's motion for summary judgment on Count VI of the second amended complaint is denied as to both defendants; NSI's cross-motion for summary judgment is granted; and NSF's cross-motion for summary judgment is granted.

IT IS SO ORDERED.