**NAME.SPACE, INC., Plaintiff–Appellant,**

v.

**NETWORK SOLUTIONS, INC. and National Science Foundation, Defendants–Appellees.**

**Docket No. 99–6080.**

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1999.

Decided Jan. 21, 2000.

---

Glenn B. Manishin, Blumenfeld & Cohen, Washington, D.C. (Stephanie A. Joyce, of counsel), for Plaintiff–Appellant Name.Space, Inc..

William M. Dallas, Jr., Sullivan & Cromwell, New York, N.Y. (Philip L. Sbarbaro, Hanson and Malloy, Washington, D.C., of counsel), for Defendant–Appellee Network Solutions, Inc.

Marla Alhadeff, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney for the Southern District of New York, Gideon A. Schor, Assistant United States Attorney, New York, N.Y., of counsel), for Defendant–Appellee National Science Foundation.

Before: MCLAUGHLIN, JACOBS and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

Plaintiff Name.Space, Inc. ("Name.Space") appeals from a judgment of the United States District Court for the Southern District of New York (Robert P. Patterson, Jr., *Judge* ), granting summary judgment for defendants Network Solutions, Inc. ("NSI") and the National Science Foundation ("NSF"). Name.Space alleged antitrust and First Amendment violations against NSI, then the sole provider of Internet domain name registration services, and NSF respectively. The district court held that the activities of NSI were immune from antitrust liability, and that Internet domain names did not constitute protected speech under the First Amendment. *See PGMedia, Inc. v. Network Solutions, Inc.,* 51 F.Supp.2d 389 (S.D.N.Y.1999). On appeal, Name.Space contends that NSI's activities are not entitled to implied antitrust immunity, and that NSF violated the First Amendment. We disagree and therefore affirm the judgment below.

1. The Internet is a vast system of interconnected computers and computer networks. *See generally Reno v. ACLU,* 521 U.S. 844, 849–53, 117 S.Ct. 2329, 138 L.Ed.2d 874

## BACKGROUND

### I. *The Internet Domain Name System*

The dispute between the parties centers on the Domain Name System ("DNS") of the Internet.[1] The DNS controls the way in which each component of the Internet identifies and communicates with one another. The various protocols that allow such communications to take place are known as Internet protocols ("IP"), and each entity connected to the Internet is assigned one or more unique numeric addresses, known as IP numbers or IP addresses. An IP address is a string of four sets of numbers, separated by periods, such as "98.37.241.30," and every host or computer on the Internet is assigned such a numerical IP address. *See* Management of Internet Names and Addresses, 63 Fed. Reg. 31,741, 31,741 (1998). In the early stages of the Internet's development, IP addresses were assigned and maintained by the late Dr. Jon Postel, whose work was eventually conducted under the auspices of a private entity known as the Internet Assigned Numbers Authority ("IANA"). *See id.* Due at least in part to the difficulty of remembering numeric IP addresses, Dr. Postel and his colleagues also administered the assignment of alphanumeric names to each host computer on the Internet. *See Developments in the Law—The Law of Cyberspace, The Domain Name System: A Case Study of the Significance of Norms of Internet Governance,* 112 HARV. L.REV. 1657, 1660 (1999). A file containing the mappings of these host names to the corresponding IP addresses was updated and maintained on each host computer. *See* 63 Fed.Reg. at 31,742.

However, as the Internet continued to grow in size and complexity, this horizontal system became increasingly unwieldy. By

(1997); *see also* Barry M. Leiner, et al., *A Brief History of the Internet* (last modified Feb. 20, 1998), <http://www.isoc.org/internet-history/brief.html>.

the mid–1980s, the time and resources necessary to update the files on each host computer, and the desire for greater local structure and control over host names, *inter alia*, suggested that a different system was necessary. Therefore, the Internet community developed a new DNS for mapping host names onto IP addresses. The current DNS has a hierarchical tree structure of names. A domain name, such as <www.uscourts.gov>, comprises a series of alphanumeric fields, or "domains," separated by periods or "dots." Within each domain name, the alphanumeric field to the far right is the Top Level Domain ("TLD"), and each prior field to the left of the period preceding the TLD is the Second Level Domain ("SLD"), the Third Level Domain, and so on. Thus, TLDs are the highest subdivisions of Internet domain names, and SLDs and other lower level domains identify the host computers and individual websites under each TLD. There are currently two different types of TLDs: seven generic TLDs ("gTLDs"), namely, ".com," ".net," ".org," ".edu," ".gov," ".int," and ".mil,"[2] and approximately 240 two-letter country code TLDs ("ccTLDs"), such as ".us," ".uk," ".jp," and ".kr."[3]

The process of converting domain names into IP numbers begins with the "root zone file," which is the highest level of the domain name system and contains the databases enabling an Internet address query to be routed to its proper destination. *See* Improvement of Technical Management of Internet Names and Address-

es, 63 Fed.Reg. 8,826, 8,826 (1998). The master root zone server of the DNS contains the authoritative root zone file, from which the other 12 duplicate root zone servers download new domain name information on a daily basis. *See* 63 Fed.Reg. at 31,742. The root zone file serves the function of directing an address query to the proper TLD zone file, which contains information regarding the location of the numerous gTLDs and ccTLDs. The TLD zone file in turn directs the address query to SLD zone files, which contain listings of all SLDs and corresponding IP numbers under the TLD in question. The SLD zone files then direct the query to lower level portions of the DNS, until the address query is fully resolved.

The parties contest NSI's control of the master root zone server and file. NSI currently maintains the master root zone server, and was the sole registrar for new domain names under the .com, .org, .net, .edu and .gov gTLDs when this action was first commenced in the district court. NSI has performed these functions since 1993, pursuant to Cooperative Agreement No. NCR–9218742 (the "Cooperative Agreement"), awarded by NSF through a competitive process pursuant to the National Science Foundation Act, 42 U.S.C. § 1861 *et seq.*, and the Federal Grant and Cooperative Agreement Act, 31 U.S.C. § 6301 *et seq.* Article 3 of the Cooperative Agreement states that NSI shall provide domain name registration services in accordance with RFC 1174.[4] RFC 1591, which superceded RFC

**2.** Currently, there are no restrictions on the types of organizations that may register for the .com, .org, and .net gTLDs, but some gTLDs, such as .gov and .mil, indicate the nature of the entities maintaining websites in that portion of the domain space. *See* IANA, *Generic Top–Level Domains* (last modified July 15, 1999), <http://www.iana.org/generic.html>.

**3.** The two-letter ccTLDs are determined pursuant to a list updated and maintained by the International Standards Organization ("ISO"), ISO 3166–1. *See* IANA, *Country Code Top–Level Domains (CCTLDs)* (last modi-

fied Oct. 31, 1999), <http://www.iana.org/cctld.html>. The list of current ccTLDs is available on the website of the ISO 3166 Maintenance Agency, which also contains additional information on the administration and content of this ISO standard. *See* ISO 3166 Maintenance Agency (ISO1366/MA) (last modified Dec. 3, 1999), <http://www.din.de/gremien/nas/nabd/iso3166ma/index.html>.

**4.** "RFCs" are "Requests for Comments," which are memoranda addressing the various protocols that facilitate the functioning of the Internet. The Internet community developed

1174 in March 1994, states that applications for new TLDs are handled by NSI "with consultation with the IANA." No new gTLDs have been added to the Internet since NSI commenced its provision of domain name registration services, although numerous ccTLDs have been.

## II. *Competition in Domain Name Registration and the Privatization of the DNS*

In recent years, there has been an increasingly contentious debate, both within the U.S. and internationally, over the addition of new gTLDs to the Internet. *See* 63 Fed Reg. at 31,743. In late 1996, Name. Space's predecessor-in-interest, pgMedia, Inc.,[5] began providing domain name registration services in competition with NSI, and accepted new registrations under approximately 530 new gTLDs, such as ".forpresident," ".formayor," and ".microsoft.free.zone." However, domain names registered under Name.Space's gTLDs are not universally resolvable, that is, they cannot be converted into the correct IP numbers by most users of the Internet, because those gTLDs are not listed in the root zone files. Thus, unless NSI amends the master root zone file to include Name. Space's new gTLDs, the domain names registered with Name.Space cannot be located by all Internet users, as Internet address queries are initially routed to the various root zone servers containing NSI's master root zone file.

On July 1, 1997, in response to growing domestic and international concerns regarding the future of the DNS, President Clinton directed the Secretary of Commerce to privatize the DNS. *See* 63 Fed. Reg. at 8,827. On February 20, 1998, after

a consultative process whereby the Department of Commerce ("Commerce Department") solicited public comments on various issues regarding the DNS, including whether new gTLDs should be added, the National Telecommunications and Information Administration-a part of the Commerce Department published a proposed rule and request for public comment, the so-called "Green Paper." *See id.* That document recommended that the DNS be managed by a private, non-profit corporation which would determine, *inter alia,* the circumstances under which gTLDs should be added to the root server system. *See id.* at 8,826–28. The Green Paper contemplated that up to five new gTLDs be added during the period of transition to private management of the DNS, in order to enhance competition and enable other entities to enter the Internet registry business. *See id.* at 8,829, 8,831.

After considering the numerous public comments that were received in response to the Green Paper, the Commerce Department published a final policy statement known as the "White Paper" on June 10, 1998. *See* 63 Fed.Reg. at 31,741. The White Paper affirmed the basic proposals of the Green Paper with some modifications, including a determination that no new gTLDs would be added to the Internet during the transition period, as such decisions would be best made by the new, globally representative non-profit corporation with input from the international community. *See id.* at 31,746. The White Paper stated that any expansion of gTLDs should proceed at a deliberate pace, in order to maintain the stability and promote the controlled evolution of the DNS. *See id.*

RFCs as a mechanism for the generation of consensus on various engineering, technical and other protocols in the early days of the Internet's history. RFCs, which were previously edited by the late Dr. Jon Postel, are openly and freely available on the Internet and periodically amended and updated. *See RFC Editor* (last modified Jan. 3, 2000), <http://www.rfc-editor.org/>. Anyone may

comment on the standards and protocols proposed or articulated in RFCs.

**5.** This Court granted Name.Space's unopposed motion to substitute parties pursuant to Rule 43(b) of the Federal Rules of Appellate Procedure on July 13, 1999. This opinion will refer to both pgMedia, Inc. and Name. Space as "Name.Space."

As part of the policy set forth in the White Paper, NSF and the Commerce Department entered into a Memorandum of Agreement on September 8, 1998 ("Memorandum of Agreement"), pursuant to which NSF transferred responsibility for administering its Cooperative Agreement with NSI to the Commerce Department, while expressly agreeing to remain responsible for defending this lawsuit. In October 1998, NSI and the Commerce Department entered into Amendment No. 11 to the Cooperative Agreement, which provides for NSI's recognition of the new non-profit corporation described in the White Paper, and the programmatic transfer of various DNS management functions to this corporation. Amendment No. 11, which extends the Cooperative Agreement though September 30, 2000,[6] also provides for the continued operation of the master root zone server by NSI until this function is transferred to the new private corporation or another entity, and states that NSI must request written direction from an authorized Commerce Department official before making any changes to the root zone file.

In the fall of 1998, the Internet Corporation for Assigned Names and Numbers ("ICANN") was incorporated as a non-profit public benefit corporation in California, in order to assume the management of the DNS as contemplated in the White Paper. ICANN's bylaws state that it is to be aided by three supporting organizations, one of which is the Domain Name Supporting Organization ("DNSO"), the entity responsible for making policy recommendations to ICANN regarding the DNS, including, among other things, new TLDs. On November 25, 1998, ICANN and the Commerce Department entered into a Memorandum of Understanding, pursuant to which they agreed jointly to develop and test the mechanisms and procedures that should be in place in the new,

privatized DNS. Specifically, ICANN and the Commerce Department agreed to collaborate on "written technical procedures for operation of the primary root server including procedures that permit modifications, additions or deletions to the root zone file."

**III. *Procedural History***

On March 11, 1997, Name.Space wrote to NSI requesting that its gTLDs be added to the root zone file. NSI responded by stating, *inter alia,* that NSI could not grant Name.Space's request, but that the request would be referred to IANA. On March 20, 1997, Name.Space filed its initial complaint alleging antitrust violations against NSI and naming IANA as a non-party co-conspirator. NSI then wrote to Dr. Jon Postel at IANA on March 27, 1997, informing him of this lawsuit and seeking to confirm NSI's understanding that it could make changes to the root zone file only at the direction of IANA. IANA responded on April 4, 1997 by denying that IANA had any authority over NSI's operations, and stating that IANA also had no authority to establish any new gTLDs in the absence of an Internet community consensus. Therefore, NSI wrote to NSF on June 10, 1997 describing the events that had transpired to date, and requesting authority to begin accepting applications for new gTLDs pursuant to a registration procedure.

By the time NSI contacted NSF, the federal government had commenced an internal policy consultation process with respect to the United States' role in the management of the DNS. Accordingly, NSF rejected NSI's proposal by letter dated June 25, 1997, and explicitly requested that NSI add no new TLDs to the root zone file pending the conclusion of this process. NSF reiterated and confirmed its directive to add no new TLDs on Au-

---

**6.** The term of the Cooperative Agreement has been further extended through Amendment No. 19 to the Cooperative Agreement. *See* ICANN, *Amendment No. 19 to Cooperative*

*Agreement Between NSI and U.S. Government* (last modified November 10, 1999), <http://www.icann.org/nsi/coopagmt-amend19–04nov99.htm>.

gust 11, 1997. On September 17, 1997, Name.Space filed a second amended complaint adding NSF as a defendant, and alleging that NSF violated Name.Space's First Amendment rights.

Name.Space filed a motion for preliminary injunction on May 15, 1998, prior to the commencement of discovery, which was converted into a motion for partial summary judgment by the district court's order dated June 1, 1998. Both NSI and NSF cross-moved for summary judgment against Name.Space. The motions were argued before the district court on July 20, 1998. However, in light of the incorporation of ICANN and the articulation and implementation of government policy in this area, by order dated December 17, 1998 the district court requested supplemental briefing on the issues of whether the lawsuit had thereby been mooted and whether a stay of proceedings was warranted. The parties filed their supplemental briefs and simultaneously entered into a stipulation on January 12, 1999. The stipulation provided that with respect to the pending motions, NSF's letters of June and August 1997 to NSI were no longer relevant, and that Name.Space would not challenge the validity of the Memorandum of Agreement the validity of Amendment No. 11 to the Cooperative Agreement, or the statutory authority underlying either of these contracts. Instead, Name.Space stipulated that it was seeking a declaration that Amendment No. 11 confers no antitrust immunity on NSI for actions taken pursuant to that Amendment, and challenging Amendment No. 11's restriction on the addition of new gTLDs on First Amendment grounds.

The district court issued a comprehensive opinion and order denying Name. Space's motion and granting the cross-motions of NSI and NSF for summary judgment on March 16, 1999. *See PGMedia,* 51 F.Supp.2d at 390. The district court dismissed Name.Space's antitrust claim on the ground that NSI was entitled to antitrust immunity under the federal instrumentality doctrine for its actions taken pursuant to the Cooperative Agreement. *See id.* at 407. The court also dismissed Name.Space's First Amendment claim, holding that Amendment No. 11 did not infringe on its free speech rights. *See id.* at 408. Adopting an analogy between Internet alphanumeric addresses and telephone number mnemonics such as 1–800–FLOWERS, the district court held that domain names did not constitute expressive speech entitled to constitutional protection. *See id.* at 407–08. Name.Space filed a timely notice of appeal on March 30, 1999.

## DISCUSSION

We review a district court's grant of summary judgment *de novo. See Jackson v. Mann,* 196 F.3d 316, 319 (2d Cir.1999). Summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

### I. *Antitrust Immunity*

The district court held that "NSI is entitled to antitrust immunity for its actions taken pursuant to the Cooperative Agreement, as amended," based on the so-called federal instrumentality doctrine. *PGMedia,* 51 F.Supp.2d at 406–07. The seminal case is *Sea–Land Service, Inc. v. Alaska Railroad,* 659 F.2d 243 (D.C.Cir. 1981), which held that "the United States, its agencies and officials, remain outside the reach of the Sherman Act." *Id.* at 246. In so holding, the District of Columbia Circuit cited *United States v. Cooper Corp.,* 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941), in which the Supreme Court held that the United States is not a "person" under the antitrust laws, such that it cannot be subject to a lawsuit under the Sherman Act. *See id.* at 614, 61 S.Ct. 742. Therefore, while the *Sea–Land* court's holding that the Sherman Act does not expose federal agencies to legal or equitable liability for alleged antitrust violations,

*see* 659 F.2d at 245, is uncontroversial, such immunity was founded on the sovereign immunity of the United States. Accordingly, the antitrust immunity of federal instrumentalities is *status*-based, rather than *conduct*-based, such that the applicability of this doctrine to private entities depends, for example, on the extent to which the federal government or its agencies directly own and/or exercise plenary control over the entity in question. *See, e.g., Sakamoto v. Duty Free Shoppers, Ltd.* 764 F.2d 1285, 1289 (9th Cir.1985) (holding that Guam is immune from federal antitrust laws because "the government of Guam is an instrumentality of the federal government over which the federal government exercises plenary control."); *IT & E Overseas, Inc. v. RCA Global Communications, Inc.,* 747 F.Supp. 6, 11–12 (D.D.C. 1990) (holding that corporation created by Guam legislature and run by board of directors appointed by the Governor of Guam with the consent of the legislature is entitled to federal instrumentality immunity). Given the status-based nature of the doctrine, the scope of the immunity conferred as a result of being a federal instrumentality is paradigmatically equivalent to that enjoyed by the United States itself, and therefore absolute. *See, e.g., Sakamoto,* 764 F.2d at 1289 ("There is no reason why Guam should enjoy less immunity than the federal government itself.").

While Name.Space recognizes that NSF is entitled to absolute immunity from the antitrust laws due to its status as a federal agency, it vigorously contests the immunity of NSI. Name.Space did not challenge the legality of NSI's monopoly over domain name registrations below, *see PGMedia,* 51 F.Supp.2d at 406, and does not raise such a challenge before this Court. Rather, Name.Space contends that NSI has abused its monopoly power over the domain name registration system to main-

tain its control of an essential facility, namely the root zone file. Name.Space argues that NSI is not entitled to immunity from this alleged antitrust violation because no express statutory immunity has been conferred on NSI by Congress, and because there is no pervasive regulatory scheme over the DNS mandating such immunity. Relying primarily on *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), Name.Space also argues that "government contracting officers do not have the power to grant immunity from the Sherman Act. Such contracts stand on their own footing and are valid or not, depending on the statutory framework within which the federal agency operates." *Id.* at 378–79, 93 S.Ct. 1022 (internal quotation marks omitted). Although NSI conceded below that it is not entitled to express antitrust immunity based on any statute, it argues that implied antitrust immunity applies to its activities under the Cooperative Agreement, as amended by Amendment No. 11. *See PGMedia,* 51 F.Supp.2d at 401.

■ We choose not to apply the essentially status-based federal instrumentality doctrine; reliance on such a broad rule of immunity might improperly insulate NSI and other private entities that are or will be involved in administering the DNS from liability for future anticompetitive conduct. Thus, NSI's mere status as a government contractor does not entitle it to implied antitrust immunity for all its conduct. Instead, looking to the "nature of the activity challenged, rather than the identity of the defendant," we choose to apply a conduct-based instrumentality doctrine. *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 58–59, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) (applying state action immunity doctrine) (citation omitted).[7] Applying that

---

**7.** While we employ a mode of conduct-based reasoning that is similar in certain respects to the analysis in state action immunity cases, we agree with the District of Columbia Circuit that such cases, including *Southern Motor*

*Carriers,* are distinguishable because (i) considerations of federalism are not implicated where the federal government is involved; and (ii) this case does not involve the state regulation of a private entity, but rather a

approach, we hold that NSI is entitled to implied conduct-based immunity with respect to its refusal to add new gTLDs to the root zone file.[8] ·Name.Space is surely correct in arguing that the existence of a government contract does not automatically confer a federal agency's absolute antitrust immunity onto a private contractor.[9] However, the conduct being challenged by Name.Space in this appeal was compelled by the explicit terms of NSI's agreement with a government agency and by the government's policies regarding the proper administration of the DNS.

The District of Columbia and the Seventh Circuits have recently declined to address the antitrust immunity of NSI with respect to Sherman Act claims brought against it.[10] *See Watts v. Network Solutions, Inc.*, No. 99–2350, 1999 WL 994012, at \*1 (7th Cir. Oct.27, 1999) (unpublished disposition); *Thomas v. Network Solutions, Inc.*, 176 F.3d 500, 508–09 (D.C.Cir. 1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000) ("Whether there is, or should be, any ... 'federal

instrumentality doctrine' in this context is not clearly settled."). It appears that these circuits were concerned about (i) the scope of NSI's immunity, which should be neither "automatic," *Watts*, 1999 WL 994012, at \*1, nor "the same ... as that enjoyed by NSF," *Thomas*, 176 F.3d at 508; and (ii) whether any discretion afforded to NSI under the Cooperative Agreement permitted NSI to abuse its monopoly power in an anticompetitive manner, as "[a] contractor might be free to perform the contract in any number of ways, only one of which is anticompetitive." *Thomas*, 176 F.3d at 509 (footnote omitted).

Neither of these valid concerns is at issue with respect to the specific circumstances of this case. Here, NSI's implied immunity is limited in scope to its refusal to add new gTLDs to the root zone file, and it had no discretion under the Cooperative Agreement and Amendment No. 11 regarding its refusal to add Name.Space's gTLDs. As noted above, the Cooperative Agreement requires NSI to provide Internet domain name registration services in

contractual relationship with the federal government in furtherance of government policy. *See Thomas v. Network Solutions, Inc.*, 176 F.3d 500, 508–09 (D.C.Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000).

8. Thus, NSI's implied antitrust immunity is limited in scope to the specific conduct that is at issue in this appeal. Because we expressly decline to take any position with respect to NSI's immunity for any other past, present or future conduct, the ensuing discussion is not merely conduct-based, but conduct-specific. In so holding, we note that although NSI's monopoly over domain name registrations has now ended through the establishment of the Shared Registration System ("SRS"), NSI remains an active participant in the SRS and in the management of the root server system at this time. *See* ICANN, *Approved Agreements Among ICANN, the U.S. Department of Commerce and Network Solutions, Inc.* (last modified Nov. 10, 1999), <http://www.icann.org/nsi/nsi-agreements.htm>; ICANN, *List of Accredited and Accreditation–Qualified Registrars* (last modified Nov. 21,

1999), <http://www.icann.org/registrars/accredited-list.html>.

9. *Otter Tail*, however, is clearly distinguishable from the case at hand; it involved a lawsuit commenced by the federal government against a private contractor who was seeking to advance its own commercial interests by enforcing its contracts against the applicable federal agency, and the contractual terms in question were found to be a hindrance to the agency's policy objectives and were originally agreed to by that agency only at the contractor's insistence. *See* 410 U.S. at 378–79, 93 S.Ct. 1022.

10. We note in passing that these appellate decisions both modified in part district court decisions erroneously holding that NSI was entitled to immunity as a federal instrumentality to the same extent as the NSF. *See Watts v. Network Solutions, Inc.*, No. IP 98–1529–C, 1999 WL 778589, at \*3 (S.D.Ind. May 7, 1999), *aff'd on other grounds*, No. 99–2350, 1999 WL 994012 (7th Cir.1999) (unpublished disposition); *Thomas v. Network Solutions, Inc.*, 2 F.Supp.2d 22, 38 (D.D.C.1998), *aff'd on other grounds*, 176 F.3d 500 (D.C.Cir. 1999).

accordance with the provisions of RFC 1174. RFC 1591, the successor to RFC 1174, states that:

> [t]he Internet Assigned Numbers Authority (IANA) is responsible for the overall coordination and management of the Domain Name System (DNS), and especially the delegation of portions of the name space called top-level domains.... Applications for new top-level domains (for example, country code domains) are handled ... with consultation with the IANA.

The Coöperative Agreement also states that the NSF "has responsibility for registration services support, support planning, oversight, monitoring, and evaluation," and that it "will make approvals required under the General Conditions." One of these General Conditions, Grant General Condition No. 8, requires NSI "to obtain prior written approval from the NSF Grants Officer whenever there are significant changes in the project or its direction." Thus, NSI first sought to consult with IANA regarding Name.Space's request that its gTLDs be added to the root zone file. When IANA declined to provide any direction and indeed disclaimed any authority with respect to the addition of gTLDs, NSI undertook to obtain NSF's approval for the significant project change of accepting applications for new gTLDs without the supervision or even the participation of IANA. NSF not only refused to give NSI the written approval required under the Cooperative Agreement, but Amendment No. 11 further memorialized and reinforced this refusal, stating that NSI "shall request written direction from an authorized [Commerce Department] official before making or rejecting any modifications, additions or deletions to the root zone file."

■ Thus, there was only one course of conduct open to NSI pursuant to the Cooperative Agreement: to refuse to add any new gTLDs to the root zone file, which refusal is precisely the basis for Name. Space's antitrust claim. If anything, as a consequence of governmental directive, NSI was prohibited from pursuing its own pecuniary interests because it could not accept application fees for new gTLDs. Clearly, any alleged abuse of monopoly power was specifically mandated by NSF and the Commerce Department. As the district court recognized, "[p]rivate parties, to the extent they are acting at the direction or with the consent of federal agencies, also fall outside the pale of the [Sherman Act,]" where the complained of acts were specifically directed by the federal government. *PGMedia,* 51 F.Supp.2d at 402 (quoting *Agritronics Corp. v. National Dairy Herd Ass'n, Inc.,* 914 F.Supp. 814, 820–21 (N.D.N.Y.1996)) (internal quotation marks omitted); *cf. Southern Motor Carriers,* 471 U.S. at 57, 105 S.Ct. 1721 (private parties acting pursuant to clearly articulated state policy and actively supervised by state entitled to state action antitrust immunity); *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 68–69 (2d Cir.1998) (same); *Alpha Lyracom Space Communications, Inc. v. Communications Satellite Corp.,* 946 F.2d 168, 174 (2d Cir.1991) ("Congress could not have intended to require [a private entity] to [act] subject to [federal governmental] directives and, at the same time, have intended that [it] proceed at its own antitrust peril in carrying out that official role.... Congress did not expect that corporation to face antitrust liability in deciding ... whether and to what extent to permit competition." (internal quotation marks and citations omitted)).

In addition, NSI's refusal to add new gTLDs was not only consistent with, but in furtherance of, the government's policy objectives as articulated in the White Paper. The White Paper expressly states that the stability and future development of the DNS is best served by not adding any new gTLDs during the transition to ICANN. *See* 63 Fed.Reg. at 31,746. Name.Space argues that the White Paper is simply not enough, as it does not amount to the per-

vasive regulatory scheme necessary for antitrust immunity under *Strobl v. New York Mercantile Exchange,* 768 F.2d 22, 26 (2d Cir.1985). Although the facts of *Strobl* are easily distinguishable-that case·did not involve a contract between a government agency and a private party-in any event the specific conduct undertaken by NSI pursuant both to the White Paper· and to the Cooperative Agreement is a direct result of government policy and is thereby entitled to implied antitrust immunity.

In sum, NSI is entitled to implied antitrust immunity for the conduct at issue in this case, as such conduct was expressly directed by the government and the terms of the Cooperative Agreement, and because it is in furtherance of the government's policy with respect to the management of the DNS.

## II. *First Amendment*

■ Name.Space challenges the district court's holding that it "has not met the burden of demonstrating that the three letter top level domain portion of an Internet domain name is expressive speech." *PGMedia,* 51 F.Supp.2d at 407 (citing *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). Although we affirm the district court's dismissal of Name.Space's First Amendment claims, we do so for different reasons. "We may, of course, affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." *Cromwell Assocs. v. Oliver Cromwell Owners, Inc.,* 941 F.2d 107, 111 (2d Cir.1991) (citations omitted).

11. Given the potential costs of categorical decisions in the absence of perfect foresight,.and the amorphous and malleable nature of First Amendment doctrine, there is reason to believe that a "decision involving the application of the First Amendment to new communications technologies, including the Internet, should be narrow, because a broad decision rendered at this time [may be in error.] . . . .

■ In considering whether domain names constitute expressive speech, we observe that the lightning speed development of the Internet poses challenges for the common-law adjudicative process-a process which, ideally while grounded in the past, governs the present and offers direction for the future based on understandings of current circumstances. Mindful of the often unforeseeable impact of rapid technological change, we are wary of making legal pronouncements based on highly fluid circumstances, which almost certainly will give way to tomorrow's new realities.[11] *Cf. Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 102, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) ("The problems of regulation are rendered more difficult because the broadcast industry is dynamic in terms of technological change; solutions adequate a decade ago are not necessarily so now, and those acceptable today may well be outmoded 10 years hence."). "A law that changes every day is worse than no law at all." LON L. FULLER, THE MORALITY OF LAW 37, 79–81 (rev. ed.1969).

■ The district court adopted an analogy between Internet alphanumeric addresses and telephone numbers, and held that domain names are akin to source identifiers rather than to communicative messages. *See PGMedia,* 51 F.Supp.2d at 407-08. We disagree. It is certainly true that while "[i]t is possible to find some kernel of expression in almost every activity a person undertakes[,] . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). Further, the district court is not alone in suggesting that an analogy between Inter-

A more evolutionary approach, involving the accretion of case-by-case judgments, could produce fewer mistakes on balance, because each decision would be appropriately informed by an understanding of particular facts." Cass R. Sunstein, *The Supreme Court, 1995 Term–Foreword: Leaving Things Undecided,* 110 HARV L.REV. 4, 18 (1996) (footnote omitted).

net domain names and telephone number mnemonics (for example, 1–800–FLOW-ERS) may be appropriate. *See, e.g., Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1325 (9th Cir.1998) (comparing domain name to 1–800–HOLIDAY); *PGMedia,* 51 F.Supp.2d at 407–08 (citing cases). However, the nature of domain names is not susceptible to such a uniform, monolithic characterization. As the Supreme Court has stated in an analogous and related context, "aware as we are of the changes taking place in the law, the technology, and the industrial structure related to telecommunications, . . . we believe it unwise and unnecessary definitively to pick one analogy or one specific set of words now." [12] *Denver Area Educ. Telecomms. Consortium, Inc. v. Federal Communications Comm'n,* 518 U.S. 727, 742, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (Breyer, J., plurality) (citations omitted). The existing gTLDs are not protected speech, but only because the current DNS and Amendment No. 11 limit them to three-letter afterthoughts such as .com and .net, which are lacking in expressive content. The district court did not address the possibility that longer and more contentful gTLDs like ".jones_for_president" and ".smith_for_senate" may constitute protected speech, such as political speech or parody. *See, e.g., Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.,* 886 F.2d 490, 493 (2d Cir. 1989) (noting that title of book "Spy Notes" is parody constituting protected

speech); *Rogers v. Grimaldi,* 875 F.2d 994, 998 (2d Cir.1989) (holding that title of movie "Ginger and Fred" contained "expressive element" implicating First Amendment).

The Internet in general, and the DNS in particular, is marked by extraordinary plasticity. The DNS has already undergone considerable change in the Internet's brief history to date, and may undergo even more radical changes in the near future under the auspices of ICANN and DNSO. There is nothing inherent in the architecture of the Internet that prevents new gTLDs from constituting expressive speech. How broad the permissible bandwidth of expression is in this context depends on the future direction of the DNS.[13] Therefore, "we should be shy about saying the final word today about what will be accepted as reasonable tomorrow," particularly "when we know too little to risk the finality of precision." *Denver Area,* 518 U.S. at 777–78, 116 S.Ct. 2374 (Souter, J., concurring).

■■ Further, the functionality of domain names does not automatically place them beyond the reach of the First Amendment. Although domain names do have a functional purpose, whether the mix of functionality and expression is "sufficiently imbued with the elements of communication" depends on the domain name in question, the intentions of the registrant, the contents of the website, and the technical protocols that govern the DNS.[14]

**12.** Therefore, different analogies, including analogies to book and movie titles, street addresses, and telephone numbers may be appropriate in different circumstances.

**13.** Already, a working group within the DNSO has reached a tentative consensus to add new gTLDs to the Internet, and the group's interim report on the proposed procedures for adding new gTLDs was open for public comment until January 10, 2000. *See* ICANN, *Domain Name Supporting Organization of ICANN* (last visited Jan, 18, 2000), <http://www.dnso.org/>; ICANN, *Interim Report of Working Group C of the Domain Name Supporting Organization* (last modified Oct. 23, 1999), <http://

www.dnso.org/dnso/notes/19991023.NCwgc-report.html>.

**14.** In conducting this analysis, it may be instructive to bear in mind that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' . . . would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

*Spence v. Washington,* 418 U.S. 405, 409–10, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) ("[T]he context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol." (citation omitted)). Functionality and expression are therefore not mutually exclusive: for example, automobile license plates have a functional purpose, but that function can be served as well by vanity plates, which in a small way can also be expressive. Similarly, domain names may be employed for a variety of communicative purposes with both functional and expressive elements, ranging from the truly mundane street address or telephone number-like identification of the specific business that is operating the website, to commercial speech and even core political speech squarely implicating First Amendment concerns.

In short, while we hold that the existing gTLDs do not constitute protected speech under the First Amendment, we do not preclude the possibility that certain domain names and new gTLDs, could indeed amount to protected speech. The time may come when new gTLDs could be used for "an expressive purpose such as commentary, parody, news reporting or criticism," comprising communicative messages by the author and/or operator of the website in order to influence the public's decision to visit that website, or even to disseminate a particular point of view. *United We Stand Am., Inc. v. United We Stand Am. N. Y., Inc.,* 128 F.3d 86, 93 (2d Cir.1997) (citation omitted).

■ We do not view *Planned Parenthood Federation of America v. Bucci* as holding to the contrary. *See* No. 97 Civ. 0629, 1997 WL 133313, at *10–11 (S.D.N.Y. Mar. 24, 1997), *aff'd,* 152 F.3d 920 (2d Cir.1998) (unpublished table decision). In *Bucci,* a trademark infringement case, the court held that the defendant's particular use of the domain name "plannedparenthood.com" was as a "source identifier" rather than a "communicative message," while leaving open the possibility that a domain name could constitute such a message under other circumstances. *See id.* In reaching this conclusion, the *Bucci* court conducted precisely the kind of particularistic, context-sensitive analysis that is appropriate here, including analyses of the domain name itself, the way the domain name is being used, the motivations of the author of the website in question, the contents of the website, and so on. See *id.* Domain names and gTLDs *per se* are neither automatically entitled to nor excluded from the protections of the First Amendment, and the appropriate inquiry is one that fully addresses particular circumstances presented with respect to each domain name.

■ The question remains whether the restrictions imposed by Amendment No. 11 are nevertheless valid under the First Amendment. Name.Space has raised a number.of different arguments characterizing NSF's refusal to permit the addition of new gTLDs as an improper restriction on free speech. None of these arguments is persuasive, however, and Name.Space's free speech rights have not been violated under any of the familiar rubrics of First Amendment analysis. First, Name.Space contends that the current gTLDs constitute compelled speech. *See, e.g., Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (recognizing that First Amendment protects the "right to refrain from speaking at all"). The parties disagree over the scope of the compelled speech doctrine, with NSF arguing that the compelled speech doctrine applies only in cases "in which an objection rest[s] on political or ideological disagreement with the content of the message," *Glickman v. Wileman Bros. & Elliott, Inc.,* 521 U.S. 457, 472, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997), and Name.Space claiming that the doctrine has broader applicability. We need not resolve this dispute, however, because little if any meaningful expressive content may be attributed to the current gTLDs. What Name.Space is allegedly being compelled to speak is simply one of

the existing three-letter gTLDs, and .com does not constitute speech under the First Amendment. Not only are the current gTLDs not expressive speech, but as appellee NSF has pointed out, any entity may currently apply for domain names within the .com, .net, and .org gTLDS, and therefore they may not convey any information about a website at all.[15] Thus, while Name.Space's proposed gTLDs may constitute expressive speech, the current gTLDs do not, such that Amendment No. 11 does not unconstitutionally compel speech.

 Second, Name.Space argues that because Amendment No. 11 requires NSI to seek the written approval of the Commerce Department before making any changes to the root zone file and such approval has been denied, it is an unconstitutional prior restraint on protected Internet expression. Citing, *inter alia, Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) and *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), Name.Space argues that this is a classic prior restraint case. It is axiomatic that prior restraints are among the most serious infringements on First Amendment rights, such that any such system of restraints bears a "heavy presumption against its constitutional validity." *Bantam Books,* 372 U.S. at 70, 83 S.Ct. 631; *see Beal v. Stern,* 184 F.3d 117, 124–25 (2d Cir.1999). However, as the district court recognized, Amendment No. 11 does not constitute a prior restraint as Name.Space may engage in any expressive speech of its choice by simply adding a period and a three-letter suffix to the speech in question. *See PGMedia,* 51

F.Supp.2d at 408; *see also Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 763 n. 2, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) ("Not all injunctions that may incidentally affect expression ... are 'prior restraints'.... Here petitioners are not prevented from expressing their message in any one of several different ways[.]").[16] Currently, Name.Space is free to use any of an infinite possible number of second-, third and fourth-level domains as long as it has not previously been registered. The difference between ".forpresident" and ".forpresident.com," ".net" or ".org" does not rise to the level of a prior restraint that offends the First Amendment. *Cf. Connecticut State Fed'n of Teachers v. Board of Educ. Members,* 538 F.2d 471, 481 (2d Cir.1976) (holding that "inconsequential," *"de minimis"* interference with free speech did not violate First Amendment).

Given that Amendment No. 11 is not a prior restraint, any restrictions that it imposes relate only to the time, place or manner of speech. *See, e.g., Paulsen v. Gotbaum,* 982 F.2d 825, 829 (2d Cir.1992) (distinguishing between a "total ban on speech" and a time, place and manner restriction). "Even speech given the widest protection by the Constitution may be subject to reasonable time, place and manner restrictions." *Paulsen,* 982 F.2d at 828 (italics omitted). Here, the degree of restriction is so minimal that it is a valid, content-neutral restriction that is narrowly tailored to serve a significant government interest, leaving open ample alternative channels for communication. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

---

**15.** The .com, .net, and .org gTLDs have been open to all registrants for the last two or three years, such that these gTLDs have lost the meanings that they once had and there is now no distinction between them. *See* David F. Gallagher, *Internet Labels Lose Meaning in Rush for Popular Addresses,* N.Y. TIMES, Nov. 29, 1999, at C5, *available at* <http://www.nytimes.com/library/tech/99/11/biztech/articles/29name.html>.

**16.** We note that the First Amendment test articulated in *Madsen* applies only to content-neutral injunctions. *See* 512 U.S. at 765, 114 S.Ct. 2516. As the parties have not raised the *Madsen* test either below or before this Court, we express no view regarding its applicability in this context.

Amendment No. 11 bans all new gTLDs regardless of their content, furthers the significant government interest in overseeing the orderly transition to a privatized DNS under ICANN, and Name.Space is free to express itself through second, third, or fourth-level domains. Not only are there ample alternative channels of communication, as noted above, but any alleged restraint may also be only temporary, as the new system of domain name administration under ICANN may be more permissive with respect to registration of new gTLDs than the status quo. While Amendment No. 11 may or may not be the least intrusive means of furthering the development of the DNS, the requirement of narrow tailoring is satisfied because the Amendment is not "substantially broader than necessary to achieve the government's interest." *Beal*, 184 F.3d at 129 ("That a provision is over and underinclusive is not generally sufficient to trigger the narrowly tailored requirement." (citation omitted)); *see also Ward*, 491 U.S. at 798–800, 109 S.Ct. 2746; *Clark*, 468 U.S. at 297, 104 S.Ct. 3065. Amendment No. 11 thus constitutes a reasonable time, place and manner restriction.

Therefore, although domain names may be sufficiently expressive to constitute protected speech, the restrictions imposed through Amendment No. 11 do not violate the First Amendment.

## CONCLUSION

We have considered all of Name.Space's other arguments and found them to be without merit. For all of the foregoing reasons, the judgment of the district court is affirmed.