**GUCCI AMERICA, INC., Plaintiff,**

v.

**HALL & ASSOCIATES, Denise Hall, and Mindspring Enterprises, Inc., Defendants.**

**No. 00 Civ 549 RMB.**

United States District Court, S.D. New York.

March 14, 2001.

Milton Springut, Tal S. Benschar, Kalow, Springut & Bressler, L.L.P., New York City, for Plaintiff.

Robert Corn–Revere, Hogan & Hartson, L.L.P., Washington, DC, for Defendants.

## DECISION AND ORDER

BERMAN, District Judge.

Plaintiff Gucci America, Inc. ("Plaintiff" or "Gucci") filed this action against defendants Hall & Associates and Denise Hall (together, "Hall") and Hall's Web page hosting service, Mindspring Enterprises, Inc. ("Mindspring" and, together with Hall, "Defendants")[1] asserting claims for trademark infringement, false designation of origin and false descriptions and representations, and unfair competition. Plaintiff also asserts a claim for breach of a prior settlement agreement, dated on or about June 1, 1997 (the "Settlement Agreement"), between Hall and Gucci.[2] Plaintiff seeks injunctive relief, damages and costs. Mindspring now moves to dismiss Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.").[3] **For the reasons stated below, Mindspring's motion is denied.**

## I. Background

Plaintiff owns the trademark and trade name "GUCCI" which is utilized on and in connection with various articles of jewelry, fashion accessories, wearing apparel and related services (the "Gucci Trademark"). (Compl. ¶ 4.) Mindspring, an Internet Service Provider ("ISP"), provides Web page

---

1. On February 4, 2000, Mindspring merged with another company to form EarthLink, Inc. The Court will continue to use the name Mindspring.

2. Gucci alleges that, despite the Settlement Agreement, Hall has continued to distribute and sell jewelry in connection with trademarked Gucci accessories and apparel. (Compl. ¶ 15b.)

3. *Hall is not a party to this motion.* (*See* Mindspring's Mot. at 2 n. 2)

hosting services to Hall,[4] (at least) at the Uniform Resource Locator ("URL")[5] www.goldhaus.com (the "goldhaus website"). (*Id.* ¶ 3C.)[6] By e-mail communications dated March 26, 1999 and March 27, 1999, Mindspring allegedly was twice notified by Plaintiff that Hall was using Mindspring's services to aid in acts of trademark infringement and unfair competition, including the advertising of jewelry on the goldhaus website which bore (and infringed) the Gucci Trademark. (*Id.*) Plaintiff alleges that, despite the emails, Mindspring continued to permit Hall to use Mindspring's Internet services to infringe Plaintiff's trademark rights, with actual knowledge of, or in reckless disregard of, Plaintiff's rights and Hall's infringement. (*Id.*) "The activities of Mindspring ... constitute willful and intentional infringement of plaintiff Gucci's registered trademark; are in total disregard of plaintiff Gucci's rights and were commenced and have continued in spite of Mindspring's knowledge that the use of the Gucci Trademark or a copy or a colorable imitation thereof, was and is in direct contravention of plaintiff Gucci's rights." (*Id.* ¶ 33.)

Plaintiff asserts claims against Mindspring for direct and contributory trademark infringement under Section 32(1) of the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1114(1), false designations of origin and false descriptions and representations under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and trademark infringement and unfair competition under New York common law. (*See* Compl. ¶¶ 1, 18, 23, 31–35.) Mindspring's instant motion is premised upon two ground: (i) that the Communications Decency Act of 1996, 47 U.S.C. § 230 ("Section 230"), "immunizes Mindspring from liability for information posted [on the goldhaus website] by [Hall]," (Mindspring's Mem. at 3); and (ii) that "Plaintiff's theory of trademark infringement is barred by the First Amendment," (*id.* at 10).

## II. Standard of Review

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "In reviewing a [Fed. R.Civ.P.] 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reason-

4. In *Columbia Ins. Co. v. Seescandy.Com,* the Court summarized the function of an ISP: ISPs provide two basic services to their clients: access and presence. Access services consist of an account through which the client can access the Internet and send e-mail. A presence account generally includes hard drive space that permits the client to have a web page or file transfer site. Persons who wish to run a site at their own domain, rather than at the domain of their service provider, can either make the significant investment in computer hardware, networking hardware, and high-speed access necessary to make their domains available on the Internet or can rent space and services from a service provider. This latter alternative, which is analogous to renting from a landlord who makes available offices in an office complex, is called domain hosting.
185 F.R.D. 573, 578 n. 1 (N.D.Cal.1999).

5. "A domain name refers to a computer, and does not refer to a particular file, such as a web page. Instead, a particular file on the Internet, such as a web page, is identified by its Uniform Resource Locator ("URL"), which includes the domain name, identifies the file, and indicates the protocol required to access the file." *America Online, Inc. v. Huang,* 106 F.Supp.2d 848, 851 n. 5 (E.D.Va.2000).

6. Specifically, Mindspring hosted Hall's website on Mindspring's internet server, enabling others to access the website. (Mindspring's Mem. at 2.)

able inferences in favor of the plaintiff." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (citing *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994)). The movant's burden is very substantial, as "[t]he issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.' " *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669 (2d Cir.1995) (quoting *Weisman v. LeLandais,* 532 F.2d 308, 311 (2d Cir.1976) (per curiam)). In sum, "[t]he motion to dismiss for failure to state a claim is disfavored and is seldom granted." *Bower v. Weisman,* 639 F.Supp. 532, 539 (S.D.N.Y.1986) (citing *Arfons v. E.I. du Pont De Nemours & Co.,* 261 F.2d 434, 435 (2d Cir.1958)).

## III. Analysis

### A. Mindspring Is Not Immune From Plaintiff's Claims

█ As Mindspring acknowledges in its motion papers, the interpretation of Section 230 as applied to the (intellectual property) facts presented here is an issue of first impression. (*See* Mindspring's Mem. at 6.) Mindspring argues that Section 230(c)(1) "immunizes [it] from liability for information posted [on the goldhaus website] by [Hall]." (Mindspring's Mem. at 3.) Section 230(c)(1) provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230(f)(2) defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a

service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *Id.* § 230(f)(2). Section 230(f)(3) defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

Plaintiff does not dispute that Mindspring, as an ISP, is an "interactive computer service." (*See* Compl. ¶ 3C.) Moreover, the complaint clearly identifies Hall as the "information content provider." (*See* Compl. ¶¶ 3C, 14–16.) Rather, Plaintiff argues that Mindspring is not immune under § 230(c)(1) from Plaintiff's claims because of the language of Section 230(e)(2), (*see* Pl.'s Mem. at 3–4): **"Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."** 47 U.S.C. § 230(e)(2). The "law[s] pertaining to intellectual property," under which Plaintiff contends that Mindspring is liable, are "a straightforward application of long-established printer-publisher liability and contributory infringement under the Lanham Act," (Pl.'s Mem. at 14). The Court believes that the pivotal issue for consideration here is whether Plaintiff's complaint would withstand a motion to dismiss even in the absence of § 230. The Court believes that the answer to this question is "yes." [7]

### 1. Plain Language Of Section 230(e)(2)

"It is axiomatic that the plain meaning of a statute controls its interpretation...." *Lee v. Bankers Trust Co.,* 166 F.3d 540,

---

**7.** The Court hastens to add that it is in no way ruling here upon the ultimate merits of Plain-

tiff's claims.

544 (2d Cir.1999) (citing *Greenery Rehabilitation Group, Inc. v. Hammon,* 150 F.3d 226, 231 (2d Cir.1998)). "[W]hen looking at its language, a court should presume that the statute says what it means." *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072–73 (2d Cir.1993) (citing *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)); *accord United States v. Piervinanzi,* 23 F.3d 670, 677 (2d Cir.1994). "Unless otherwise defined, individual statutory words are assumed to carry their ordinary, contemporary, common meaning." *Hammon,* 150 F.3d at 231 (quotation and citations omitted); *accord Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). "Indeed, when the words of a statute are unambiguous, this first cannon is also the last [and] judicial inquiry is complete." *Piervinanzi,* 23 F.3d at 677 (quotations and citations omitted).

Section 230(e)(2) unambiguously constrains the Court to construe Section 230(c)(1) in a manner that would neither "limit or expand any law pertaining to intellectual property." 47 U.S.C. § 230(e)(2). Thus, the inquiry involves the application of existing intellectual property law. Under existing intellectual property law, publishers may, under certain circumstances, be held liable for infringement. *See* 15 U.S.C. § 1114(2)(A)(B); *see also Century 21 Real Estate Corp. of Northern Illinois v. R.M. Post, Inc.,* No. 88 C 0077, 1988 WL 84741 (N.D.Ill. Aug. 9, 1988) (denying motion to dismiss where yellow pages' publishers were alleged to have infringed by listing trademark of (former) licensee who no longer had right to use

trademark). Moreover, the United States Supreme Court has held, under the doctrine of contributory infringement, that "if a manufacturer or distributor ... continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement," the manufacturer or distributor itself may held be liable for infringement. *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982); *see also Religious Technology Ctr. v. Netcom On–Line Communication Servs.,* 907 F.Supp. 1361, 1375 (N.D.Cal.1995) (holding that an ISP with knowledge of the infringement may be held liable for contributory copyright infringement). Immunizing Mindspring from Plaintiff's claims, therefore, would "limit" the laws pertaining to intellectual property in contravention of § 230(c)(2). *See Mirriam–Webster's Collegiate Dictionary* 676 (10th ed.1998) (defining "limit," when used as a verb, to mean "to restrict the bounds or limits of").[8] **The plain language of Section 230(e)(2) precludes Mindspring's claim of immunity.**

Although Mindspring recognizes the "appeal" of the Court's reading of Section 230(e)(2), (Mindspring's Mem. at 6), Mindspring nevertheless argues that immunity from Plaintiff's claims "would not 'limit' any law pertaining to intellectual property, since liability for trademark infringement has never previously been imposed on an ISP in this situation," (*id.*). Mindspring further contends that the inclusion of the words "or expand" in Section 230(e)(2), and the omission of "or expand" from the other subsections of Section 230(e),[9] suggests that Mindspring's inter-

**8.** The Court of Appeals for the Second Circuit has relied on Webster's dictionary to determine the ordinary meaning of individual statutory words. *See, e.g., Hammon,* 150 F.3d at 232; *Piervinanzi,* 23 F.3d at 677.

**9.** In addition to addressing intellectual property laws, Section 230(e) sets forth certain limitations upon the immunity created by Section 230 under federal criminal law, state law that is "consistent" with Section 230, and

pretation is the "most reasonable interpretation" because "[o]therwise, the language 'or expand' has no purpose." (Mindspring's Reply at 4.)

The Court respectfully disagrees for the reason that Mindspring's reading is in conflict with the plain language of the statute. Mindspring argues that Section 230(e)(2) directs courts to leave "the state of the law ... as it was when the law was enacted—neither 'limited' nor 'expanded.'" (Mindspring's Reply at 3.) However, nowhere does Section 230 state that the laws to which it refers are, as Mindspring suggests, limited to the intellectual property laws as they existed in 1996.[10] The Court declines to incorporate or read into the statute a temporal limit. *See Grin v. Shine*, 187 U.S. 181, 186, 23 S.Ct. 98, 47 L.Ed. 130 (1902) ("[W]e are not bound to import words into the statute which are not found there...."), *cited with approval in Austin v. Healey*, 5 F.3d 598, 602 (2d Cir.1993) (declining to import a special delegation requirement into a statute).

The Court rejects the suggestion that the words of Section 230(e)(2) are ambiguous and, therefore, finds no need to resort to other cannons of statutory construction. *See Lee*, 166 F.3d at 544 ("Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous.") (citing *Aslanidis*, 7 F.3d at 1073).[11]

Although the plain meaning of Section 230(e)(2) ends the instant inquiry with respect to Mindspring's motion to dismiss, the Court explains below its disagreement with Mindspring's remaining arguments. *See Hammon*, 150 F.3d at 233 ("Although our review of the plain meaning of [the statute] ends our inquiry, we note that we do not believe that [the related regulation] or its history provide any support for the [appellee's] conclusion....").

### 2. Case Law

Mindspring contends that the case law interpreting Section 230—but not specifically subsection (e)(2)—supports its' interpretation. (*See generally* Mindspring's

federal and state privacy law. *See* 47 U.S.C. § 230(e).

**10.** Congress passed section 230 as part of the Communications Decency Act of 1996. Mindspring alleges that "Section 230(e)(2) could only expand intellectual property rights if it were construed to permit claims against ISPs that did not exist before it was adopted." (Mindspring's Reply at 4 n. 6.)

**11.** Even assuming it were appropriate to employ additional cannons of construction, the Court's interpretation of Section 230(e)(2) would not change. "Section 230's legislative history provides no clues as to the meaning of the unadorned 17 words that comprise [Section 230(e)(2) ]." (Mindspring's Mem. at 6–7). *See infra*, at III.A.3 for further discussion of legislative history.

Moreover, the captions to Section 230(e) ("Effect on other laws") and subsection (e)(2) ("No effect on intellectual property law") support the Court's reading. *See Almendarez-*

*Torres v. United States*, 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (quotations and citation omitted)). Also, inclusion of the words "or expand" in Section 230(e)(2) and their omission from other subsections of Section 230 do not lead ineluctably to the conclusion that "Section 230(e)(2) cannot be read to bar Section 230 immunity in all trademark cases," (Mindspring's Mem. at 7). As Plaintiff theorizes, "the difference in language can be accounted for simply by the fact that Congress was concerned that Section 230 might somehow be construed to expand as well as limit intellectual property rights, whereas there seems little reason to believe that Section 230 might be construed to expand the criminal laws or privacy laws referenced in the other subsections." (Pl.'s Mem. at 6.)

Mem. at 5–10.) [12]  Mindspring quotes the Court of Appeals in *Zeran v. America Online, Inc.:* "the plain language of Section 230 'creates a federal immunity to *any* cause of action that would make service providers liable for information originating with a third-party user of the service.'" 129 F.3d 327, 330 (4th Cir.1997) (*See* Mindspring's Mem. at 5 (emphasis in original).)  The quoted language is not apposite here.  In *Zeran,* plaintiff brought a negligence action against America Online ("AOL") alleging that AOL had "unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar posting thereafter."  129 F.3d at 328.  The District Court "granted judgment for AOL on the grounds that [Section 230] bars Zeran's claims."  *Id.*  In affirming, the Court of Appeals stated:

> Zeran seeks to hold AOL liable for **defamatory speech** initiated by a third party....
>
> By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third party user of the service.  Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for the exercise of a publisher's traditional editorial functions— such as deciding whether to publish, withdraw, postpone or alter content— are barred.
>
> The purpose of this statutory immunity is not difficult to discern.  Congress recognized the threat that **tort-based lawsuits** pose to freedom of speech in the new and burgeoning Internet medium. The imposition of **tort liability** on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech....
>
> Congress made a policy choice ... not to deter harmful online speech through the separate route of imposing **tort liability** on companies that serve as intermediaries for other parties' potentially injurious messages.

*Id.* at 330–31 (emphasis added).  The *Zeran* quotation, in context, refers to defamation and other forms of tort liability.  The instant claims are grounded in the law of intellectual property and, therefore, do not, on a motion to dismiss, implicate Section 230 immunity.[13]

---

**12.** "This is a case of first impression with respect to the interpretation of Section 230(e)(2)." (Mindspring's Mem. at 6.)

**13.** Similarly, *Blumenthal v. Drudge,* 992 F.Supp. 44 (D.D.C.1998) and *Ben Ezra, Weinstein and Co. v. America Online, Inc.,* 206 F.3d 980 (10th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 69, 148 L.Ed.2d 33, 69 U.S.L.W. 3001 (U.S. Oct. 2, 2000) (No. 99–2020), like *Zeran,* involve either defamation or other common law torts relating to the dissemination of damaging information, but do not involve intellectual property rights.  *See Ben Ezra,* 206 F.3d at 983–86 (defamation and negligence); *Drudge,* 992 F.Supp. at 46, 49–53 (defamation); *see also Doe v. America Online, Inc.,* 783 So.2d 1010 (2001) (negligence).

By letter dated Nov. 16, 2000, Mindspring cites *Stoner v. eBay Inc.,* No. 305666, 2000 WL 1705637 (Cal.Super.Ct. Nov. 1, 2000), in which, the California Superior Court held that eBay was immune (under Section 230) from liability pursuant to Cal.Bus. & Prof. Code § 17200.  Plaintiff responds that *Stoner* "has no relevance to this case" because, "[a]lthough the plaintiff there apparently complained about sales of 'bootleg sound recordings ... [he did not] bring typical intellectual property causes of actions, such as claims for copyright, trademark or patent infringement,'" but rather sued under Cal.Bus. & Prof.Code § 17200 whose "'sweeping language' has been construed to reach 'anything which can properly be called a business practice and that at the same time is forbidden by

Mindspring also argues that *Lockheed Martin Corp. v. Network Solutions, Inc.,* 985 F.Supp. 949 (C.D.Cal.1997), *aff'd,* 194 F.3d 980 (9th Cir.1999), "rejected the application of contributory [trademark] infringement in the Internet context." (Mindspring's Mem. at 9.) Plaintiff counters that *Lockheed Martin* held only that a "domain name registrar could not be held liable [for trademark infringement] because its involvement is limited to the *registration* of the domain name and not its *use* in commerce...." (*Id.* at 13.) "Indeed," argues Plaintiff, "*Lockheed Martin* contrasted the domain name registrar's role with that of ISPs and indicated that the latter may well be liable for contributory trademark infringement." (*Id.* at 14.)

The Court agrees that *Lockheed Martin* does not foreclose the possibility that ISPs may be liable for contributory trademark infringement:

> [Network Solutions, Inc.'s] role in the Internet is distinguishable from that of an Internet service provider whose computers provide the actual storage and communications for infringing material, and who therefore might be more accurately compared to the flea market vendors in [*Fonovisa Inc. v. Cherry Auction, Inc.,* 76 F.3d 259 (9th Cir.1996) ] and [*Hard Rock Cafe Licensing, Corp. v. Concession Servs., Inc.,* 955 F.2d 1143 (7th Cir.1992) ].[14]

985 F.Supp. at 962. Moreover, in a footnote to the above passage, reprinted in part below, the District Court specifically described Section 230 as providing "tort immunity," and distinguished claims asserted under the law of intellectual property:

> The Court notes, however, that the tort law analogy used in *Fonovisa* and *Hard Rock* probably would not apply to Internet service providers any better than it applies to NSI.... *See Zeran v. America Online, Inc.,* 129 F.3d 327, 330–31 (4th Cir.1997) (noting the Congress created a tort immunity for Internet service providers in [Section 230] ...); **but see [Section 230(e)(2) ] (providing that the tort immunity does not limit or expand any law pertaining to intellectual property).**

985 F.Supp. at 962 n. 7 (emphasis added).[15]

Mindspring suggests that certain copyright law developments, for which "[t]here have been no comparable developments in the area of trademark law," (Mindspring's Mem. at 8), support its contention that "immunizing Mindspring under Section 230 does not limit existing trademark law in any way," (*id.* at 10.) Specifically, Mindspring argues that the principles of *Religious Technology Ctr. v. Netcom On–Line Communication Servs., Inc.,* 907 F.Supp. 1361 (N.D.Cal.1995) "were incorporated into statutory law when Congress

---

law.' " (Pl.'s Letter dated Nov. 21, 2000 (quoting *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,* 17 Cal.4th 553, 71 Cal.Rptr.2d 731, 950 P.2d 1086, 1090 (1998)).)

**14.** *Hard Rock* and *Fonovisa* held that a defendant can be held liable for contributory trademark infringement under the test set forth in *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), where the defendant exercised "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark." *Lockheed Martin,* 194 F.3d at 984.

**15.** *Lockheed Martin* also suggests that an ISP may be held liable for printer liability under 15 U.S.C. § 1114(2)(A). In *Lockheed Martin,* the court rejected plaintiff's § 1114(2)(A) claim because "[plaintiff's] assertion misapprehends NSI's function as a domain name registrar." The court stated that "NSI is not an Internet service provider. [NSI] does not provide host computers for Web sites or other Internet resources." 985 F.Supp. at 958.

adopted ... the Digital Millennium Copyright Act [of 1998]" ("DMCA") (Mindspring's Mem. at 8).[16] Mindspring concludes that Congress, having had the opportunity (when enacting the DMCA) to alter the extent to which ISPs may assert statutory immunity from **trademark** infringement, "has not done so." (*Id.* at 10.)

The Court respectfully disagrees with Mindspring's conclusion and finds that Congress' enactment of the DMCA—pertaining only to copyright infringement—two years after Section 230 was passed, lends further support to the proposition that Section 230 does not automatically immunize ISPs from all intellectual property infringement claims. To find otherwise would render the immunities created by the DMCA from copyright infringement actions superfluous. *See Lojuk v. Johnson,* 770 F.2d 619, 623 (7th Cir.1985) (affirming District Court where interpretation of statute as providing absolute immunity would render superfluous a narrower immunity authorized in a later added subsection of the statute).

### 3. Legislative History

Although Mindspring concedes that no legislative history exists regarding subsection (e)(2), it, nevertheless, argues that the general legislative history of Section 230 supports its position. (Mindspring's Mem. at 6–7.) "The purpose of [Section 230] was to immunize online service providers from liability for content that they did not produce, while at the same time preserving their discretion to adopt editorial policies that could result in the deletion of objectionable content." (Mindspring's Mem. at 5.) Plaintiff responds that "the legislative history indicates that Section 230 was meant to overrule cases holding ISPs liable for defamation, particularly *Stratton–Oakmont, Inc. v. Prodigy Servs. Co.,* 1995 WL 323710 (N.Y.Sup.Ct.1995)."[17] (Pl.'s Mem. at 2.)

The Court, for purposes of resolving the instant motion, agrees with Plaintiff. The legislative history cited by Mindspring indicates only that Section 230(c) immunizes ISPs from defamation and other, non-intellectual property, state law claims arising from third-party content. *See* H.R.Conf. Rep. 458, 104th Cong.2d Sess. 194 (Jan. 31, 1996) ("One of the specific purposes of [Section 230] is to overrule [*Stratton–Oakmont* ] and any other similar decisions which have treated [interactive computer service] providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material.").

### B. Plaintiff's Claims Are Not Barred By The First Amendment

■ Mindspring contends that Plaintiff "is advocating the adoption of a 'trademark plaintiff's veto,' in which an ISP would be held to strict [or notice-based] liability[18] if it does not immediately censor speech that

---

**16.** *Netcom* held that an ISP may be liable for contributory copyright infringement where the service provider has knowledge of the infringement. 907 F.Supp. at 1373.

**17.** In *Stratton Oakmont,* the plaintiffs, a securities investment banking firm and its president, asserted that defendant Prodigy Services Company, an ISP, was liable for allegedly defamatory statements made about the plaintiffs by an unidentified user of one of Prodigy's bulletin boards. In finding Prodigy liable, the court determined that Prodigy "exercised sufficient editorial control over its computer bulletin boards to render it a publisher with the same responsibilities as a newspaper." *Stratton Oakmont,* 1995 WL 323710, at *3.

**18.** Mindspring refers to "strict liability" and also to "notice-based liability" somewhat interchangeably. (*See* Mindspring's Mem. at 10–12; Mindspring's Reply at 5–10.)

is the subject of a dispute," and that "[t]his theory of liability conflicts with the First Amendment because it would force ISPs, who are in no position to adjudicate conflicting claims, to restrict summarily online speech." (Mindspring's Mem. at 10.) Plaintiff counters that (1) "commercial speech which deceives or causes confusion is not protected by the First Amendment," (Pl.'s Mem. at 16–17); (2) "the innocent infringer defense adequately protects the constitutional rights of parties like Mindspring," (*id.* at 20); and (3) "Congress has already made the contrary policy judgment by excluding intellectual property laws from Section 230's immunity," (*id.* at 15).

### 1. Infringing Commercial Speech

Plaintiff's trademark claims against Mindspring are not "barred" by the First Amendment because, they challenge allegedly infringing commercial speech used to identify the source of a product.[19] (*See* Compl. ¶¶ 14, 15b, 16, 20, 21, 25, 26, 33, 34.) *See Planned Parenthood Fed'n of Am., Inc. v. Bucci,* No. 97 Civ. 0629(KMW), 1997 WL 133313, at *10 (S.D.N.Y. Mar. 24, 1997) (Internet case) ("[T]rademark infringement law does not curtail or prohibit the exercise of the First Amendment right to free speech.... Defendant's use of another entity's mark is entitled to First Amendment protection when his use of that mark is part of a communicative message, not when it is used to identify the source of a product.").

The Lanham Act cases cited by Mindspring expressing First Amendment concerns involve the use of a trademarked term that had an additional expressive element or was part of a communicative message that went beyond commercial identification of the source of a product. *See, e.g., Rogers v. Grimaldi,* 875 F.2d 994, 999 (2d Cir.1989); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.,* 886 F.2d 490, 494–95 (2d Cir.1989); *Yankee Publ'g Inc. v. News Am. Publ'g Inc.,* 809 F.Supp. 267, 275–76 (S.D.N.Y.1992). Mindspring's reliance on *American Civil Liberties Union of Georgia v. Miller,* 977 F.Supp. 1228 (N.D.Ga.1997), is also not dispositive. In *Miller,* Internet users brought an action for declaratory and injunctive relief challenging the constitutionality of a state criminal statute which prohibited Internet transmissions that falsely identify the sender, or that use trade names or logos that falsely state or imply that the sender was legally authorized to use them. *See* 977 F.Supp. at 1230. The District Court granted plaintiffs' motion for a preliminary injunction, (*see id.* at 1235), ruling that the statute was both unconstitutionally "overbroad" and "vague," (*id.* at 1233–34.) However, *Miller* is distinguishable from the instant case: the District Court in *Miller* stated that the language of the Lanham Act, as contrasted with the criminal statute at issue here, is both more limited in scope (*see id.* at 1233 n. 6), and more precisely defined, (*see id.* at 1234.)

### 2. Innocent Infringer Defense

The liability limitation afforded under the "innocent infringer" defense, contained

---

**19.** To prevail on a Lanham Act claim, a plaintiff must prove that the "use in commerce" of the trademark in connection with goods or services is "likely to cause confusion, to cause mistake, or to deceive," 15 U.S.C. §§ 1114(1) & 1125(a)(1)(A), or "misrepresents the nature, characteristics, qualities or geographic origin" of such goods or services, *id.*

§ 1125(a)(1)(B). *See Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 960 (2d Cir.1996). A plaintiff in New York must make a similar showing to establish its common law claims. *See Forschner Group, Inc. v. Arrow Trading Co.,* 124 F.3d 402, 408 (2d Cir.1997).

in Section 32(2) of the Lanham Act, codified at 15 U.S.C. § 1114(2) ("Section 32(2)"), appears to detract from Mindspring's argument that Plaintiff's claims "conflict[ ] with the First Amendment," (Mindspring Mem. at 10). Section 32(2) provides in pertinent part:

(2) Notwithstanding any other provision of this Act, the remedies given to the owner of a right infringed under this Act or to a person bringing an action under section 1125(a) or (d) of this title shall be limited as follows:

(A) Where an infringer or violator is engaged solely in the business of printing the mark or violating matter for others and establishes that he or she was an innocent infringer or innocent violator, the owner of the right infringed or person bringing the action under section 1125(a) of this title shall be entitled as against such infringer or violator only to an injunction against future printing.

(B) Where the infringement or violation complained of is contained in or is part of paid advertising matter in a newspaper, magazine, or other similar periodical or in an electronic communication as defined in section 2510(12) of title 18, United States Code, the remedies of the owner of the right infringed or person bringing the action under section 1125(a) of this title as against the publisher or distributor of such newspaper, magazine, or other similar periodical or electronic communication shall be limited to an injunction against the presentation of such advertising matter in future issues of such newspapers, magazines, or other similar periodicals or in future transmissions of such electronic communications. The limitations of this subparagraph shall apply only to innocent infringers and innocent violators. . . .

15 U.S.C. § 1114(2)(A)–(B).

■ Section 32(2) limits trademark plaintiffs' remedies against printers and publishers or distributors "for others" of "electronic communication[s]" who are "innocent infringers" to (prospective) injunctions against future printings or transmissions of the infringing material.[20] *See* 15 U.S.C. § 1114(2)(A)–(B). Although "[t]he

---

20. Congress amended Section 32(2) in 1988 to include electronic media. Trademark Law Revisions Act of 1988, Pub.L. 100–667, Title I, § 127, 102 Stat. 3943; *see* 134 Cong.Rec. H10411–02 (Oct. 19, 1988) (Remarks of Rep. Kastenmeier) (Section 32(2), as amended, "is updated to include electronic media, incorporating the definition set forth in the Electronic Communications Privacy Act, codified at 18 U.S.C. [§ ] 2510(12)."). As defined in the Electronic Communications Privacy Act, the term "electronic communication," used in Section 32(2), means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12). Moreover, "[p]roviders of Internet services . . . have traditionally been viewed as subject to the Electronic Communications [Privacy] Act." *In re U.S.*, 36 F.Supp.2d 430, 432 (D.Mass.1999) (citing *McVeigh v. Cohen*, 983 F.Supp. 215, 219 (D.D.C.1998) ("[T]he Electronic Communications [Privacy] Act, enacted by Congress to address privacy concerns on the Internet, allows the government to obtain information from an online service provider.")).

Mindspring suggests that "[t]he purpose of the 1988 amendments was to extend the innocent infringer defense to radio and television," but that "Congress could not have contemplated applying the Lanham Act to commercial websites (or to ISPs) in 1988, since the World Wide Web did not yet exist, nor did the business of providing Internet access." (Mindspring's Reply at 6.) Plaintiff (persuasively) counters that the definition of "electronic communication" set forth in the Electronic Communications Privacy Act "precisely describes the typical commercial internet website such as maintained by Hall and Associates . . . with the aid of Mindspring's facilities and services." (Pl's. Mem. at 12.)

phrase 'innocent infringer' is not defined in the statute," *World Wrestling Fed'n v. Posters, Inc.,* No. 99 C 1806, 2000 WL 1409831, at *2 (N.D.Ill. Sept. 26, 2000), it has been construed to embrace the "actual malice" standard set forth in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), i.e. an infringer is "innocent" unless it acted either (1) with knowledge of the infringement or (2) with reckless disregard as to whether the material infringed the trademark owner's rights. *See World Wrestling Fed'n,* 2000 WL 1409831, at *3; *NBA Properties v. Untertainment Records LLC,* No. 99 Civ. 2933(HB), 1999 WL 335147, at *14 (S.D.N.Y. May 26, 1999). Under *Sullivan,* defamation plaintiffs who show "actual malice" may, in appropriate circumstances, recover damages without running afoul of the First Amendment. *See* 376 U.S. at 279–80, 84 S.Ct. 710. That trademark plaintiffs also must meet this "heightened standard" and show "actual malice" to recover damages, *NBA Properties,* 1999 WL 335147, at *13–*16, suggests that the innocent infringer defense satisfies the requirements of the First Amendment in the context of trademark infringement.[21]

The strictures of the "innocent infringer defense" (and the corresponding requirement that plaintiffs demonstrate "knowledge" under the contributory infringement doctrine) undermines Mindspring's argument that accepting Plaintiff's claims would subject Mindspring to "strict liabili-

ty" or "notice-based liability" for trademark infringement, thereby creating a "trademark plaintiff's veto." (Mindspring's Mem. at 10–12.)[22] This result is not pre-ordained. *See, e.g., World Wrestling Fed'n,* 2000 WL 1409831, at *2–*4, *NBA Properties,* 1999 WL 335147, at *15–*16; *see also Inwood Labs.,* 456 U.S. at 854, 102 S.Ct. 2182 ("[I]f a manufacturer or distributor . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible. . . ."); *Polymer Tech. Corp. v. Mimran,* 975 F.2d 58, 64 (2d Cir.1992); *Polo Ralph Lauren Corp. v. Chinatown Gift Shop,* 855 F.Supp. 648, 650 (S.D.N.Y.1994).

Similarly, trademark plaintiffs bear a high burden in establishing "knowledge" of contributory infringement. The Court in *Lockheed Martin,* for example, held that a trademark owner's mere assertion that its domain name is infringed is insufficient to impute knowledge of infringement. *See* 985 F.Supp. at 963. Moreover, while "uncertainty of infringement [is] relevant to the question of an alleged contributory infringer's knowledge[,] . . . . [a] trademark owner's demand letter is insufficient to resolve this inherent uncertainty." *Id.* at 964.

### 3. Internet Context

Mindspring asserts: "As a general matter, enforcement of trademark law is limit-

---

**21.** The "stringent requirements under the actual malice standard," *NBA Properties,* 1999 WL 335147, at *15, impose a "heavy burden of proof" on plaintiffs, *Contemporary Mission, Inc. v. New York Times,* 842 F.2d 612, 621 (2d Cir.1988) (quotation and citation omitted). In *Bose Corp. v. Consumers Union of United States,* the Supreme Court stated that "[t]he burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth

of his statement." 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (citations omitted); *see also Contemporary Mission,* 842 F.2d at 621, 624 ("[A] finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing.").

**22.** The Court reiterates that in denying a motion to dismiss, it in no way is passing upon the ultimate merits of Plaintiff's claims.

ed by the First Amendment.... This principle is particularly important with respect to freedom of speech on the Internet." (Mindspring's Mem. at 10–11.) Plaintiff counters that "the Internet is [not] so different in kind from other media as to constitute a new Constitutional actor." (Pl.'s Mem. at 23.) The Second Circuit has employed the First Amendment/trademark rights analysis, *supra* at III.B.1, in the Internet context. *See Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, 585–86 (2d Cir.2000); [23] *see also OBH, Inc. v. Spotlight Magazine, Inc.,* 86 F.Supp.2d 176, 197 (W.D.N.Y.2000) (" 'Domain names ... per se are neither automatically entitled to nor excluded from the protections of the First Amendment....' Whether a particular domain name is entitled to protection under the First Amendment depends on the extent of its communicative message.") (quoting and citing *Name. Space,* 202 F.3d at 586).

Mindspring's reliance on *ACLU v. Reno,* 217 F.3d 162 (3d Cir.2000), and other non-trademark cases is not compelling. For instance, *Zeran*'s discussion that "liability upon notice has a chilling effect on the freedom of Internet speech," 129 F.3d at 333, is not presented in the context (existing here) of balancing First Amendment and trademark rights, but rather in the context of ascertaining that "[l]iability upon notice would defeat the dual purposes advanced by § 230." *Id.* As the *Zeran* Court noted, Section 230 reflects a "policy choice," not a First Amendment imperative, to immunize ISPs from defa-

mation and other "tort-based lawsuits," driven, in part, by free speech concerns. *See id.* at 330–31. Congress also made the (policy) choice that Section 230 has "no effect on intellectual property law." 47 U.S.C. § 230(e)(2).

Similarly, *Reno*'s statement, quoted by Mindspring, that "there are crucial differences between a 'brick and mortar outlet' and the online Web that dramatically affect a First Amendment analysis," 217 F.3d at 175, while no doubt true, was made in a different context. In *Reno,* the Court of Appeals granted a preliminary injunction against the enforcement of the Child Online Protection Act of 1998 ("COPA"), 47 U.S.C. § 231, on the ground that COPA's use of the "contemporary community standards" test of *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), to define, "material that is harmful to minors," rendered the statute unconstitutionally "overbroad." 217 F.3d at 173–180.

> Unlike a "brick and mortar outlet" with a specific geographic locale, and unlike the voluntary physical mailing from one geographic location to another, as in *Miller,* the ... Web is not geographically constrained.... Web publishers are without any means to limit access to their sites based on the geographic location of particular Internet users.

*Id.* at 175. The distinguishing properties of cyberspace that prompted the Court of Appeals to find that "Miller's 'community

---

**23.** In *Name.Space,* the Second Circuit stated in part:

[W]hile we hold that existing [generic Top Level Domains ("gTLDs") ] do not constitute protected speech under the First Amendment, we do not preclude the possibility that certain domain names and new gTLDs, could indeed amount to protected speech. The time may come when new gTLDs could be used for "an expressive

purpose such as commentary, parody, news reporting or criticism," comprising communicative messages by the author and/or operator of the website in order to influence the public's decision to visit that website, or even to disseminate a particular point of view.

202 F.3d at 586 (quoting *United We Stand Am., Inc. v. United We Stand Am. N.Y., Inc.,* 128 F.3d 86, 93 (2d Cir.1997)).

standards' test ... has no applicability to the Internet and the Web," *id.* at 180, do **not** impel the conclusion, promulgated by Mindspring, that the Internet context necessarily alters First Amendment/trademark rights analysis.

## IV. Conclusion

For the foregoing reasons, Mindspring's motion to dismiss [9–1] is denied. Counsel are directed forwith to contact Court Deputy Christine Murray (at (212) 805–6715) to arrange a settlement/scheduling conference with the Court. **The parties are directed to engage in good faith settlement negotiations prior to the conference.**